**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Patrick J. CUNNINGHAM and John J. Sweeney, Defendants-Appellants.**

Nos. 690, 701, Dockets 81–1455, 81–1457.

United States Court of Appeals,
Second Circuit.

Argued Dec. 18, 1981.

Decided Feb. 18, 1982.

· Samuel J. Buffone, Washington, D. C. (Michael E. Tigar, Linda Huber, Tigar, Buffone & Doyle, P. C., Washington, D. C., on the brief), for defendant-appellant Cunningham.

John J. Sweeney, pro se.

Michael Kennedy, New York City (Sheryl E. Reich, Michael Kennedy, P. C., New York City, on the brief), for defendant-appellant Sweeney.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City (Gerald E. Lynch, Robert S. Litt, Asst. U. S. Attys., New York City, on the brief), for plaintiff-appellee.

Befo.e MESKILL and KEARSE, Circuit Judges, and METZNER, District Judge.*

KEARSE, Circuit Judge:

Defendants Patrick J. Cunningham and John J. Sweeney appeal from an order of the United States District Court for the Southern District of New York, Charles L.

---

* The Honorable Charles M. · Metzner, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

Brieant, *Judge*, disqualifying their respective attorneys in a pending criminal prosecution.[1] The court disqualified Cunningham's counsel, Michael E. Tigar, from any further representation of Cunningham in connection with the present case on the ground that Tigar's previous representation of John Spain, an unindicted coconspirator whom the government plans to call as a witness, created a conflict of interest for Tigar. The court disqualified Sweeney's counsel, Michael Kennedy, from appearing as trial counsel in the present case on the ground that he ought to be a witness at the trial to explain the expected testimony of Gay McCreery, whom the government plans to call as a witness. Because we conclude that, in all the circumstances, Cunningham's interest as a criminal defendant in being represented in this matter by counsel of his own choice outweighs the government's interest in disqualifying Tigar, we reverse the district court's order with respect to Cunningham. Because we conclude that Sweeney's interest as a criminal defendant in being represented at trial by counsel of his own choice should be protected if McCreery's testimony is not admissible into evidence, thereby eliminating any need for Kennedy to be a witness, we vacate the district court's order with respect to Sweeney and remand for further proceedings to determine whether McCreery's testimony will be admissible.

## I. FACTS

The present prosecution was commenced on July 1, 1981, with the filing of an indictment charging Cunningham and Sweeney, who are lawyers and members of the New York City law firm Sweeney, Cunningham & Krieg, P.C., with *inter alia*, conspiring between 1972 and 1981 to evade the income tax laws, to obstruct various criminal and grand jury investigations, and to impede the prosecution of an alleged coconspirator. In particular, Cunningham is charged with conspiracy, income tax evasion, filing of false tax returns, perjury, false statements, and obstruction of justice, in violation of 18 U.S.C. §§ 371, 1001, 1510, 1623, and 2 (1976), and 26 U.S.C. §§ 7201 and 7206(1) (1976). Sweeney is charged with conspiracy, perjury, and making false statements, in violation of 18 U.S.C. §§ 371, 1623, and 1001.

The investigation that led to the indictment was begun some six years before by the Internal Revenue Service ("IRS"), focusing on Cunningham's tax liability. At the time, Cunningham, who had long been active in Democratic Party politics, serving at various times as Chairman of the Bronx Democratic County Committee, Chairman of the New York State Democratic Committee, and a member of the Democratic National Committee, was the subject of a criminal investigation by New York Special Prosecutor Maurice Nadjari. From the outset of the IRS investigation, Cunningham was represented by Tigar, who represented him also in the Nadjari investigation and related litigation.[2] The IRS investigators sought a substantial amount of information relating to the defendants' law firm and requested, *inter alia*, the production of numerous firm documents. During at least part of this time defendants assert that their firm was represented by Kennedy. Kennedy apparently undertook representation of Sweeney individually in mid-1980.

Shortly after the present indictment was filed, Tigar and Kennedy entered their appearances for Cunningham and Sweeney, respectively. Thereafter the government moved to disqualify both Tigar and Kennedy on the basis of events that occurred during the investigation that led to the indictment. The events involved John

---

1. Orders disqualifying counsel are immediately appealable. *See Armstrong v. McAlpin*, 625 F.2d 433, 440–41 (2d Cir. 1980) (en banc), *vacated on other grounds*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). The appeals of Cunningham and Sweeney were consolidated and expedited by order of this Court.

2. In 1975 Cunningham had retained Edward Bennett Williams and Tigar, who was then a member of Williams's firm. Tigar came to be primarily responsible for handling Cunningham's cases, and when Tigar left the Williams firm in 1977 to form his own firm, Cunningham continued to retain Tigar.

Spain, a friend and political associate of Cunningham.

### A. Tigar's Representation of Spain

In January 1978, Spain was interviewed by IRS agents about certain payments he allegedly had made to Cunningham. Spain apparently told the IRS at that time that he had paid Cunningham $2000 in cash for legal services in 1975.[3] In June 1980, however, Spain testified to a grand jury that he had not made such a statement to the IRS. As a result Spain was indicted for perjury before the grand jury in violation of 18 U.S.C. § 1623. After his indictment, Spain sought to retain Tigar to defend him. Tigar informed Spain that he would be unable to represent Spain at trial, since he already represented Cunningham. Tigar suggested that Spain instead retain another lawyer, Gustave Newman, but offered to assist in Spain's defense. Tigar was paid a $5000 retainer and met with Spain on at least three occasions thereafter; he arranged for Spain to be examined by a psychiatrist (who later testified at Spain's trial that Spain suffered from an impaired memory), and helped prepare pretrial motions. Newman, however, was responsible for the conduct of Spain's case and completed the trial preparation without Tigar's assistance. Newman represented Spain at trial, and Tigar's role apparently ended before trial.

### B. Kennedy and the Trial of Spain

Spain was brought to trial on the perjury charge in February 1981, and Kennedy was to figure behind the scenes of a hearing held in connection with that trial. At the trial, Marie Falco, Cunningham's secretary at Sweeney, Cunningham & Krieg, P. C., testified for Spain. She stated that in January 1978 Spain had reported to her the substance of his IRS interview, that at that time he said he had denied to the IRS that he had paid Cunningham $2000 in cash, and that she had prepared a memorandum to record this contemporaneous report. Falco produced such a memorandum, dated January 25, 1978, and it was admitted into evidence. The government, however, suspecting that Falco's testimony and the memorandum had been fabricated by Cunningham and Falco, obtained a court order on February 12 requiring Sweeney, Cunningham & Kreig, P. C., to produce the typewriter on which Falco claimed to have typed the memorandum. Later that day the firm produced the typewriter, which was equipped with a virtually new ribbon. Since it was possible that the predecessor ribbon might have revealed that the Falco memorandum had been typed recently rather than three years before, as claimed, a separate hearing was held on February 13–19 to determine whether anyone had tampered with the typewriter before it was produced.

At the hearing, Gay McCreery, a receptionist at Sweeney, Cunningham & Kreig, P. C., testified on February 17 that the typewriter was generally located at her desk, but that it was rarely used. She stated that the ribbon had been changed a month before in connection with a servicing of the machine, and that since then she had used the machine only to type a short memorandum and to address a number of envelopes for Cunningham on February 12. The government responded that afternoon, February 17, by obtaining a subpoena directing the firm to produce these envelopes; McCreery returned on February 18, however, to testify that she had been unable to locate them. On February 19, Cunningham testified that on February 16, i.e., the day before the subpoena was served, he no longer needed the envelopes, and that he therefore had thrown them into a garbage can outside his building. The hearing ended inconclusively; no findings of fact were made.

---

**3.** On April 9, 1981, in entering a plea of guilty to a charge of criminal contempt of court, Spain told the court that in 1976 Cunningham had told him that Cunningham was under investigation by the IRS and by Special Prosecutor Nadjari and needed to show a legitimate source of income for 1975. Spain stated that Cunningham asked him to say that he had paid Cunningham $2000 in cash in 1975. Spain informed the court that although he had not paid Cunningham $2000 in cash at any time, he agreed to, and did, make the requested statement to the IRS agents in January 1978.

The Spain trial ended in a mistrial when the jury was unable to agree on a verdict. When the government announced its intention to retry Spain, he agreed to plead guilty to criminal contempt, a lesser offense, and to testify against Cunningham. Thereafter, McCreery testified before the grand jury about a conversation she had had with Kennedy before her testimony at the hearing on February 18. She told the grand jury:

> Mr. Kennedy told me that I would probably be questioned about the envelopes. I was not to worry about the envelopes, the envelopes were safe. The envelopes are his responsibility they were not my responsibility. He then said that the government had not been helpful to them, and if the government wanted the envelopes they would have to find them.

### C. The Disqualification of Tigar as Cunningham's Counsel

In support of its motion to disqualify Tigar from representing Cunningham in the present action, the government stated that it would call Spain as a witness at trial. It expected Spain to testify that, at Cunningham's request, he had lied to the IRS agents, and that thereafter he had lied to the grand jury about his statements to the IRS. (*See* note 3 *supra.*) Since Tigar had represented Spain in the early stages of the prosecution of Spain for perjury, the government contended that that prior representation would prevent Tigar from vigorously cross-examining Spain in Cunningham's behalf. The government argued that Cunningham had the right to be represented by counsel free of any conflict of interest and that this was a right that Cunningham could not waive. It also argued that Tigar's continued representation of Cunningham would create an appearance of professional impropriety.

Spain himself did not move to disqualify Tigar from representing Cunningham. At the hearing on the government's motion, the United States Attorney reported that he had spoken with Spain's present attorney, who declined to join in the government's motion:

> He is not objecting to Mr. Tigar's continued participation and he does not file any objection, but at the same time Mr. Spain is not waiving any attorney-client privilege.

Cunningham opposed the government's motion, arguing that he would be prejudiced by the removal of his repeatedly victorious counsel, that Spain's interests could be protected by Tigar's simply forbearing to use nonpublic information about Spain, and that Cunningham would waive his right to be represented by counsel who had no such duty of forbearance. As to his long relationship with Tigar, Cunningham pointed out that he had first been represented by Tigar in 1975 in connection with the Nadjari investigation of Cunningham's activities as Bronx Democratic Chairman. The Nadjari grand jury returned four indictments against Cunningham; through the efforts of Tigar all four were dismissed for lack of evidence. *See, e.g., People v. Cunningham,* 88 Misc.2d 1065, 390 N.Y.S.2d 547 (Sup.Ct. Bronx Co. 1976). In addition, Tigar represented Cunningham before the United States Supreme Court in a successful action to invalidate a New York statute that had been invoked in an attempt to compel Cunningham to testify before a grand jury in the Nadjari investigation. *Lefkowitz v. Cunningham,* 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

As to the prior representation of Spain, Tigar stated that his meetings with Spain were limited in number, duration, and scope, and he represented that he had learned no facts from Spain that Spain had not thereafter revealed on the record during his trial. Tigar represented that he would not exploit any information as to which Spain has a valid and existing attorney-client privilege.

Cunningham stated expressly, both in writing and orally in response to extensive questioning by the court, that he was willing, in order to retain Tigar, to waive any rights he might have to be represented by an attorney who did not have this conflict of interest. Cunningham pointed out that

he was a law school graduate and a member of the bar and stated that he had read and understood all of the papers submitted in connection with the government's motions, that he was fully aware of his rights and the possible consequences of waiving those rights, and that he voluntarily sought to waive those rights in order to continue to be represented by Tigar. He urged the court to recognize his right under the Sixth Amendment to the Constitution to be represented by counsel of his choice.

The district court concluded that Cunningham was capable and desirous of making a knowing waiver, and it construed Cunningham's statements as a conditional waiver. The court encouraged Cunningham to consult independent counsel experienced in federal criminal matters and indicated that Cunningham could withdraw his waiver before the trial began. Nonetheless, in an opinion filed on October 29, 1981, the court granted the government's motion to disqualify Tigar. Expressly declining to rely on the possibility that Cunningham might be prejudiced if he were represented by a lawyer having a conflict of interest, slip op. at 25, and rejecting the government's contention that Cunningham's right was, as a matter of law, not waivable, *id.* at 26, the court found that Tigar possessed confidential information from Spain which was protected by attorney-client privilege, *id.* at 21, and concluded that it would therefore be impossible for Tigar to represent Cunningham without violating his duty to Spain, *id.* at 22. The court ruled that Tigar's representation of Cunningham would thus create an appearance of professional impropriety, *id.* at 26, and, relying principally on *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2d Cir. 1973), and *United States v. Ostrer,*

597 F.2d 337 (2d Cir. 1979), the court disqualified Tigar "from all future representation of [Cunningham] in connection with the trial of this Indictment,"[4] slip op. at 25.

### D. The Disqualification of Kennedy as Sweeney's Trial Counsel

In support of its motion to disqualify Kennedy from representing Sweeney at trial, the government pointed out that Sweeney, with Cunningham, is charged with having conspired to obstruct the hearing on the authenticity of the Falco memorandum introduced at the trial of Spain. The government stated that it would call as a witness McCreery, who would testify to the conversation in which Kennedy told her that the subpoenaed envelopes were "safe" and that the government would have to find them if it wanted them.

The government claimed that Kennedy ought to be a witness at Sweeney's trial to rebut, corroborate, or explain McCreery's testimony. On this basis it argued that Kennedy must be disqualified as counsel under Rules 5–101(B) and 5–102(A) of the Disciplinary Rules of the American Bar Association Code of Professional Responsibility ("Disciplinary Rules"), which prohibit a lawyer from accepting or continuing employment in contemplated or pending litigation if he knows, or if it is obvious, that he or a lawyer in his firm ought to be called as a witness.[5]

Sweeney opposed the motion, arguing that McCreery's testimony would be inadmissible, on either hearsay or attorney-client privilege grounds, and that, in any event, Kennedy too would be prevented from testifying on this issue on grounds of attorney-client privilege. In addition, Sweeney, a practising lawyer who stated that he had read and understood all of the

---

4. The court stated that its disqualifications of Tigar and Kennedy did not in any way reflect upon the integrity, competency, or good faith of either attorney.

5. Disciplinary Rule 5–101(B), with exceptions not relevant here, provides as follows:
   A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness . . . .

Disciplinary Rule 5–102(A) provides, in relevant part, as follows:
   If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial . . . .

papers submitted on the government's motions and was fully aware of his rights and the possible consequences of waiving those rights, explicitly waived both his right to call Kennedy as a witness and his right to be represented by counsel free of the potential conflict of interest. He urged the court to recognize his constitutional right to be represented by counsel of his choice.

Although the court concluded that Sweeney was capable and desirous of making a knowing waiver, in its October 29 opinion the court granted the government's motion to disqualify Kennedy and his firm from serving as Sweeney's trial attorneys. Slip op. at 19–20. On the premise that McCreery's testimony might be admissible at trial, and that if it were, Kennedy ought to be a witness, *id.* at 19, the court concluded that Disciplinary Rule 5–102(A) required the disqualification of Kennedy, slip op. at 26. Unlike Tigar's disqualification, however, which was "total," Kennedy's disqualification was "limited to participation in the trial itself." *Id.* at 25. The court permitted Kennedy and his firm to "continue pretrial discovery in the case, . . . participate in the preparation for trial, and advise . . . the attorney who will defend the case," but not "to be the attorney of record or conduct the trial, or sit at counsel table." *Id.* at 20. The court adhered to its decision on reconsideration.

## II. DISCUSSION

■ The principal issue before us is the extent to which a defendant in a criminal prosecution is entitled to be represented by counsel of his own choice despite plausible reasons for holding that the counsel he has chosen should be disqualified from the case. The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This constitutional guarantee generally ensures that a criminal defendant may be represented by any counsel who will agree to take his case. Although "[a] defendant's right to counsel of his choice is not an absolute one," *United States v. Ostr-*

*er,* 597 F.2d 337, 341 (2d Cir. 1979), we have consistently recognized that the right of a defendant who retains counsel to be represented by that counsel is " 'a right of constitutional dimension'." *United States v. Wisniewski,* 478 F.2d 274, 285 (2d Cir. 1973), quoting *United States v. Sheiner,* 410 F.2d 337, 342 (2d Cir.), *cert. denied,* 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969). Hence we have observed that the "[c]hoice of counsel should not be unnecessarily obstructed by the court." *United States v. Bernstein,* 533 F.2d 775, 788 (2d Cir. 1976), *citing United States v. Sheiner, supra,* 410 F.2d at 342. *See also United States v. Bubar,* 567 F.2d 192, 203 (2d Cir. 1977) (recognizing a defendant's "constitutional right to be represented by counsel of his own choice"); *United States v. Armedo-Sarmiento,* 524 F.2d 591, 592 (2d Cir. 1975) (Sixth Amendment protects criminal defendant's selection of retained counsel).

■ In determining whether the right of the accused to counsel of his choosing should be honored in a particular case, we must balance the defendant's constitutional right against the need to preserve the highest ethical standards of professional responsibility. The balancing process leads us to differing conclusions with respect to Cunningham and Sweeney.

### A. *Cunningham's Counsel*

In the case of Cunningham the balance tips decidedly toward honoring his retention of Tigar. Cunningham's interest in having Tigar represent him is particularly strong. Unlike many defendants who retain counsel only upon arrest or indictment, Cunningham has relied on Tigar for more than six years in a substantial number of investigations, prosecutions, and related litigations. Tigar's success on behalf of Cunningham, obtaining the dismissal of four criminal indictments and the invalidation by the United States Supreme Court of a state statute, has naturally enhanced Cunningham's confidence in Tigar. Tigar represented Cunningham throughout the six-year IRS investigation and is apparently thoroughly familiar with all nuances of the government's

case, which includes allegations of a conspiracy spanning nearly a decade. The disqualification of Tigar from any further role in Cunningham's defense in this case would not merely defeat Cunningham's abstract right to be represented by counsel of his choice; it could subject him to real prejudice in this criminal prosecution.

The government's interest in disqualifying Tigar, on the other hand, is relatively weak, and we believe the disqualification is suggested neither by prior case law nor by the circumstances. The case whose facts most closely parallel those of the present prosecution is *United States v. Armedo-Sarmiento, supra*, 524 F.2d 591. In *Armedo-Sarmiento*, two defendants in a criminal prosecution had retained a law firm that theretofore had represented, in a substantially-related criminal case, three individuals whom the government planned to call as witnesses at trial. The government moved to disqualify the law firm on the ground that the three individuals were important government witnesses. Upon questioning two of the individuals and being advised that they were unwilling to waive their attorney-client privileges, the district court granted the motion to disqualify the defendants' counsel. We reversed, pointing out that,

> [a]lthough the right to an attorney of one's choosing is not unlimited, the Sixth Amendment does give some protection to a criminal defendant's selection of retained counsel.

524 F.2d at 592. We concluded that "the district court did not give sufficient weight to the [defendants'] rights," and that the defendants' constitutional rights outweighed the government's interest in disqualifying the defendants' attorney. *Id.* Since the district court had not given the defendants an opportunity to make a knowing and voluntary waiver of their rights to be represented by attorneys who had no conflicting interest, we remanded the case to give the defendants such an opportunity, concluding our opinion with the instruction that every effort be made to accommodate the interests of both the defendants and the witnesses:

> If the [defendants] do elect to proceed with [their present attorneys], it is to be understood that the witnesses will be entitled to full protection in preserving the confidentiality of their privileged communications with these attorneys, and they may refrain from answering any questions ... which are based on privileged communication. Moreover, the trial judge will, in his conduct of the trial, exert every reasonable effort to prevent inadvertent disclosures of confidential information.

*Id.* at 593. Thus, *Armedo-Sarmiento* strongly suggests that the disqualification of Tigar should be reversed.

The principal case relied on by the government and by the district court to support Tigar's disqualification is *Emle Industries, Inc. v. Patentex, Inc., supra*, in which we recognized our responsibility

> to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility.

478 F.2d at 564–65. The circumstances in *Emle*, however, bear little resemblance to those of the present case. *Emle* involved an attorney who had represented a corporation in a four-year lawsuit and who later brought suit on behalf of another client against the corporation, raising one of the issues that had been present in the prior litigation. We held that the appropriate balancing of the competing interests led to the conclusion that the attorney should be disqualified. The principal *Emle* factors, *i.e.*, an attorney switching sides and a challenge mounted by the former client, are not present with respect to Cunningham. More importantly, there is a factor in Cunningham's case that was not present in *Emle*: *Emle* was a civil case in which no Sixth Amendment rights were implicated. In balancing the various interests in *Emle*, the court was not concerned with any factor of constitutional dimension. Thus, as we observed in *Armedo-Sarmiento, supra*, in finding the lower court's reliance on *Emle* and other civil cases misplaced,

[b]ecause these civil cases do not involve the crucial factor of the criminal defendant's Sixth Amendment rights, . . . they are not controlling in the present case. 524 F.2d at 593.

■ The principal *criminal* case relied on by the government and the district court is *United States v. Ostrer, supra,* 597 F.2d 337. There we upheld the disqualification of the defendant's counsel, but again the circumstances differed from those present here. In *Ostrer* the defendant's attorney had formerly been a government prosecutor who had personally handled the prosecutions of two persons who were to be government witnesses at Ostrer's trial. The government moved for disqualification on the ground that the attorney had, as a government lawyer, obtained nonpublic information that he could use in defense of Ostrer. The district court granted the motion and we affirmed, observing that a defendant's right to counsel of his choice is not an absolute one, and that the fair and proper administration of justice required that the constitutional right yield when the former client sought to disqualify the attorney in order to protect its privilege. *Id.* at 341. The significant difference between the present case and *Ostrer* is that although in both the government is the moving party, in *Ostrer* the government was also the former client. Our decision in *Ostrer* went no further than holding that the former client may secure the attorney's disqualification. *Accord: United States v. Kaufman,* 429 F.2d 240, 247 (2d Cir.) (upholding disqualification of defendant's attorney on motion of a codefendant who was a prior client of the attorney), *cert. denied,* 400 U.S. 925, 91 S.Ct. 185, 27 L.Ed.2d 184 (1970). Thus, in *Ostrer* we stated that

disqualification motions should be granted where the attorney in question is potentially in a position to use privileged information obtained during *prior representation of the movant.* . . . Disqualification of counsel in such cases is rooted in notions of fundamental fairness; allowing an attorney to represent a client in a situation where he may use information obtained in the course of former representation of the client's adversary gives the client an "unfair advantage."

597 F.2d at 339–40 (footnote and citations omitted; emphasis added). No case has been called to our attention, and we are aware of none, in which an attorney has been disqualified on grounds of conflicting prior representation solely at the behest of a person other than the former client or its privy.[6] In *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 88 (5th Cir. 1976), the Fifth Circuit stated, in the context of civil litigation, that "[a]s a general rule, courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification."[7] The refusal to disqualify in the absence of a motion by the former client is all the more appropriate in the context of a criminal prosecution with its implication of constitutional rights.

■ We conclude, therefore, that prior case law provides no precedent for the disqualification of Tigar as Cunningham's counsel at the behest of the government, and that *Armedo-Sarmiento,* in principle, requires the denial of the government's motion. Nor do the factual circumstances of the present case justify departure from *Armedo-Sarmiento* in order to disqualify Ti-

---

6. Disciplinary Rule 9–101(B), which provides that

   [a] lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee,

   may, of course, provide a ground of disqualification even where the lawyer has not changed sides and the former client does not object. *See General Motors Corp. v. City of New York,* 501 F.2d 639 (2d Cir. 1974).

7. In the *Yarn Processing Patent* case, the court ruled that the moving party, which was neither the former client nor its privy, had no standing to assert the client's privilege. We do not suggest here that the government lacks standing to seek disqualification of Tigar. We believe the government has a sufficient interest in preserving the integrity of a criminal proceeding in which one of its potential witnesses is a former client of the defendant's counsel to allow the government to raise the question.

gar, for all of the interests that the government asserts it wishes to protect, *i.e.,* those of Spain, of Cunningham, and of the public, may adequately be protected without disqualification of Tigar.

■ Spain, the former client, does not seek to have Tigar disqualified. Spain has been represented by independent counsel since immediately after his own approach to Tigar. While Spain does not waive his right to assert his attorney-client privilege with regard to Tigar, neither Spain nor his counsel views the risk of an intrusion into that privilege as substantial enough to justify endorsing the government's motion for disqualification. Their view finds objective support in several facts. First, Tigar's representation of Spain was on a quite limited basis, in part because Spain and his principal counsel knew that Tigar represented Cunningham and would continue to do so. Second, many, if not all (as Tigar contends), of the factual bases for any cross-examination of Spain by Tigar were aired on the public record during the trial of Spain. And finally, Cunningham is willing to have Tigar's cross-examination of Spain limited to the matters disclosed in the record of the Spain trial. We see no reason why the interests of Spain cannot adequately be protected in these circumstances without the disqualification of Cunningham's counsel.[8]

■ As to the right of Cunningham that the government states it seeks to protect, we see no reason why Cunningham is not entitled to make the waiver needed to ensure the protection of Spain's attorney-client privilege. We reject the government's contention that this right cannot be waived, *see Armedo-Sarmiento, supra,* and

agree with the district court that in fact the right has preliminarily been waived. A sophisticated attorney and politician, Cunningham was questioned extensively by the district court, which concluded that he was capable and desirous of making an intelligent and knowing waiver of his right to have an attorney who has no conflicting interest. Cunningham has demonstrated that he adequately perceives the circumstances and that he is willing to have circumscribed whatever right he might otherwise have to a fuller cross-examination of Spain, in order to retain Tigar as his counsel. In the circumstances, if Cunningham's right to counsel of his choice conflicts with his right to an attorney of undivided loyalty, we think the choice as to which right is to take precedence should be left to Cunningham and not be dictated by the government.

Finally, as to the government's interest in avoiding any appearance of professional impropriety on the part of Tigar, we believe the integrity of the system is adequately preserved by the public record made in this case. The interests of the former client are to be protected to his satisfaction. The interests of Cunningham have been adequately protected by the determination that his waivers are knowing and intelligent. In these circumstances we believe the integrity of the system will best be served by not permitting the government to secure the disqualification of counsel who has represented Cunningham for such an extensive period.

Accordingly, we reverse the order of the district court disqualifying Tigar from representing Cunningham. The district court

---

**8.** In so concluding we do not suggest that an attorney-client privilege is lost by the mere fact that the information communicated is otherwise available to the public. The privilege attaches not to the information but to the communication of the information. Thus, Spain may be examined as to any fact but may not, absent a waiver, be compelled to say whether or not he communicated that fact to his counsel. Likewise, his counsel may not be examined as to communications from Spain and may not be examined as to facts he learned only from such confidential communications.

When an attorney examines his former client there would normally be a danger that the attorney might seek to elicit information as to facts that he learned only through his prior representation of the witness. We consider this danger minimal in the present case, where a public record of facts regarding Spain was created at Spain's trial, and Tigar's cross examination of Spain will be limited to those matters of public record.

may take appropriate steps, including limiting cross-examination to matters of public record, to ensure that Tigar does not violate Spain's attorney-client privilege.

### B. *Sweeney's Counsel*

The disqualification of Kennedy presents very different considerations. Sweeney's interest in securing a reversal of the disqualification of Kennedy is less strong, and the interests of the government and the public in sustaining the disqualification are potentially compelling. The outcome of the balancing of these factors, however, is not, at this stage, entirely clear.

Sweeney's interest in retaining Kennedy, while weaker than Cunningham's interest in retaining Tigar, goes beyond the abstract interest of any defendant in protecting his right to be represented by counsel of his own choice. Kennedy has represented Sweeney since mid-1980 and, as counsel to the defendants' law firm, he has had a substantial involvement in many of the events leading to the present indictment. Nevertheless, the disadvantage to Sweeney as a result of the disqualification is reduced considerably by the limited nature of the disqualification. The district court ruled that Kennedy may participate in all aspects of the defense except the actual trial. Further, even as to the trial there is no suggestion that Kennedy may not be present in the courtroom so long as he does not appear as counsel and is not situated at the counsel table. Thus, Sweeney's interest here is a significant one, but it is only his right to have Kennedy appear at trial and be identified as counsel of record that is at issue, not his more significant right to have Kennedy participate in his defense.

The government's interest in disqualifying Kennedy, on the other hand, may be particularly strong. Sweeney and Cunningham are charged with having conspired to obstruct the perjury trial of Spain by fabricating the Falco memorandum and then destroying evidence that could have revealed the recent fabrication. McCreery is expected to testify to a conversation between herself and Kennedy in which Kennedy's statements are subject to an interpretation that would readily support the charges against Sweeney and Cunningham. If McCreery's testimony is admitted at trial, it requires no great leap of the imagination to conclude that Kennedy ought to be a rebutting witness, either to deny the conversation, or to provide an innocent explanation for the jury to consider. If Kennedy were to be sworn as a witness it is clear that he should not serve as trial attorney. As Ethical Consideration 5–9 of the American Bar Association Code of Professional Responsibility explains:

> If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility.

Hence Disciplinary Rule 5–102(A) would require that Kennedy and his firm withdraw as trial counsel.

Sweeney seeks to avoid this restriction in part by offering to forgo having Kennedy testify at trial and waiving his right to counsel who could more effectively represent him. Such waivers would not avoid the impropriety foreseen by the drafters of the Disciplinary Rules, however, because if McCreery testifies and Kennedy acts as Sweeney's trial counsel, the effect would be to make Kennedy an unsworn witness. Thus if Kennedy were to cross-examine McCreery, for example, or if in his summation to the jury he were to argue the plausibility of McCreery's testimony or to offer an interpretation of the words attributed to him, he would implicitly be testifying as to his version of the conversation. There may be a perfectly innocent explanation to Kennedy's statement that "the envelopes were safe" (for example, they were safe from government discovery because Cunningham had destroyed them two days before, as Cunningham would later testify), or it may be that Kennedy did not make the statement at all. But Kennedy cannot sug-

gest one of these possibilities even on commonsense grounds, directly or indirectly, without implicitly testifying as an unsworn witness. Since as an unsworn witness he would not be subject to cross-examination or explicit impeachment, the interest sought to be protected by the Disciplinary Rules would be even more seriously eroded than if Kennedy appeared as a sworn witness. We therefore conclude, in balancing Sweeney's interest in retaining counsel of his own choice against that of the government in disqualifying Kennedy as trial counsel, that the disqualification of Kennedy must stand—assuming that McCreery's testimony is admissible.

Sweeney argues that McCreery's testimony as to her conversation with Kennedy will be inadmissible at trial on either of two grounds. First he contends that since Kennedy was acting as attorney for the firm of Sweeney, Cunningham & Krieg, P. C., at the time of the alleged statement, the statement to McCreery, who was a firm employee about to respond further to a subpoena served on the firm, is protected by the attorney-client privilege, and hence, at the instance of a member of the firm, may not be disclosed. Second, Sweeney contends that even if not protected by privilege, the statement of Kennedy as reported by McCreery would be hearsay and thus inadmissible at trial. The district court found both contentions, at first blush, unpersuasive. As to the privilege claim, the court pointed out that the privilege does not extend to "statements apparently made in furtherance of a crime." Opinion on Reconsideration at 4. Nonetheless, the court did not find that Kennedy's statement was necessarily so classified, and it stated that Sweeney's suggestions as to why the privilege was available could not be substantiated "short of a plenary trial of this Indictment." *Id.* at 5. As to the hearsay contention, the court felt that the trial judge *"might* reasonably" find that Kennedy was an agent or a coconspirator of Sweeney and

Cunningham in the obstruction of the Spain trial, thus making Kennedy's testimony admissible as nonhearsay under Fed.R.Evid. 801(d)(2)(D) or 801(d)(2)(E). *Id.* at 6 (emphasis in original). But the district court expressly denied that it was presently making such a ruling.[9] *Id.* Thus, although the admissibility of McCreery's testimony is the underpinning of Kennedy's disqualification, the question of admissibility has not definitely been decided.

In the circumstances, we believe that Sweeney's Sixth Amendment right to be represented by counsel of his own choice is too important to be denied on the basis of a mere, though substantial, possibility. If Kennedy is disqualified now and McCreery is not allowed to testify to Kennedy's alleged statement, Sweeney will have lost his constitutional right for no good purpose. We see no reason why a pretrial hearing cannot be held to determine the admissibility of McCreery's testimony, in order that the balancing task of the court may be done on the basis of a complete record and adequate information.

Accordingly, we vacate the order of the district court disqualifying Kennedy from representing Sweeney at trial and remand the case for a hearing to determine whether McCreery's testimony will be admissible. If the district court determines that the testimony will be admissible in the government's case-in-chief, it should adhere to its disqualification of Kennedy and his firm as Sweeney's trial counsel. If the court rules that McCreery's testimony would be admissible only in rebuttal of specific arguments that Sweeney might make at trial, Sweeney should be given the opportunity to make an appropriate waiver of his right to present such arguments.

## CONCLUSION

The order of the district court disqualifying Cunningham's counsel is reversed. The order disqualifying Sweeney's counsel is vacated and the case is remanded for further

---

**9.** Kennedy was not named as a coconspirator in the indictment; nor was he listed in the government's bill of particulars naming theretofore unidentified persons who the govern-ment contends were coconspirators. At oral argument below, the government seemed to suggest that it might amend its bill to include Kennedy.

proceedings not inconsistent with this opinion, with jurisdiction retained in the Court of Appeals.