UNITED STATES of America

v.

Charles J. KERLEGON.

Crim. No. 88–20013–02.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

July 7, 1988.

Joseph S. Cage, Jr., U.S. Atty., Howard Cobb Parker, Asst. U.S. Atty., for U.S.

Richard Ieyoub, Dist. Atty., Lake Charles, La., Special Asst. U.S. Atty.

Wilford Carter, Eddie Stephens, Lake Charles, La., for defendant Kerlegon.

RULING ON GOVERNMENT'S MOTION TO DETERMINE EXISTENCE OF CONFLICT OF INTEREST PURSUANT TO RULE 44

VERON, District Judge.

This matter comes before the court upon motion of the United States of America to determine the existence of any conflict of interest pursuant to Rule 44 of the Federal Rules of Criminal Procedure as it relates to Wilford Carter's representation of Charles Kerlegon.

Charles Kerlegon is one of three co-defendants in this matter. Charles Kerlegon, along with the other co-defendants, served as a commissioner of the seven member Lake Charles Dock Board at the time the federal grand jury indictment was handed down. The indictment alleges that Mr. Kerlegon, along with the other co-defendants, conspired to and did extort monies in violation of the Hobbs Act, Title 18 U.S.C. § 1951. Specifically, the indictment alleges that the defendants conspired to and did extort a total of approximately $11,000 from Mr. Bill Henry, co-owner and president of Port Stevedoring, Inc. Lake Charles, in return for a favorable dock board vote awarding Mr. Henry's stevedoring company the right to do substantial business with the Port of Lake Charles.

Wilford Carter has enrolled as counsel in this matter on behalf of Charles Kerlegon. Eddie Stephens is also enrolled as co-coun-

sel for Mr. Kerlegon. In addition to being a practicing attorney in the Lake Charles, Louisiana area, Wilford Carter is a member of the Louisiana House of Representatives representing District 34, a district which encompasses most of the North Lake Charles area. Mr. Carter has recently been re-elected to a second four-year term.

Lake Charles Dock Board Commissioners are appointed by the Governor of Louisiana and confirmed by majority vote of the Louisiana Senate. The local "delegation," which is comprised of the state senators and representatives from the Lake Charles/southwest Louisiana area, made recommendations to the Governor whenever new appointments to the Dock Board became necessary. Wilford Carter was a member of that delegation which recommended that Charles Kerlegon be appointed as Dock Board Commissioner. Charles Kerlegon was appointed by Governor Edwin W. Edwards, confirmed by the Louisiana Senate and began serving on the Lake Charles Dock Board in 1985.

Wilford Carter has represented to this court that he has served as Mr. Kerlegon's attorney for many years and has represented Kerlegon on a number of matters outside of the case at hand.

On June 7, 1988 Assistant United States Attorney Howard C. Parker addressed a letter to Wilford Carter and Eddie Stephens advising them that it was the position of the United States that a serious conflict of interest existed in Wilford Carter's representation of Charles Kerlegon. This letter has been made a part of the record as an attachment to the above entitled motion. The letter outlined the Government's perceived conflicts as follows:

1. Wilfred [sic] Carter has a vested and personal interest in the outcome of the current Indictment which goes well beyond the Attorney Client relationship.

2. Wilfred Carter's contact with Charles Kerelegon [sic] in October, November of 1987, relative to payoffs received by Wilfred Carter makes Wilfred Carter a possible witness in the Dock Board Case now pending.

3. It is my appreciation that Charles Kerelegon will eventually testify before a Grand Jury, be it post conviction, post acquittal, or pursuant to a negotiated plea and his Grand Jury testimony will cover his activities on Wilfred Carter's behalf relative to the receipt of funds by Wilfred Carter to influence the Dock Board.

4. Should any plea negotiations become attractive to Charles Kerelegon, it is my appreciation that Wilfred Carter cannot objectively evaluate his client's best interest when he well knows that his client can be a witness against him in a criminal prosecution ancillary to the current Dock Board Indictment.

The letter went on to state that should Mr. Carter fail to withdraw as counsel for Mr. Kerlegon the Government would file the motion presently under consideration by the Court.

Wilford Carter responded to the letter in writing expressing his view that no conflict existed at that time. Mr. Carter also requested that he be furnished with a number of F.B.I. surveillance tapes which purportedly depicted himself and the Government's chief witness Mr. Henry. Carter indicated that after viewing those tapes, if he perceived a conflict of interest he would withdraw as counsel on his own accord.

Shortly thereafter, the court held an open, on the record, pretrial conference to deal primarily with the issue of discovery and the surveillance tapes. At the conference, the Government indicated it had furnished defense counsel with all of the tapes it had in its possession with the exception of a handful of "disputed tapes" which the Government contended were not relevant to the present case. A number of those disputed tapes were audio and video tapes pertaining to the F.B.I. investigation of Wilford Carter and his involvement with the Lake Charles Dock Board, according to the Government. The remainder of the tapes related to the F.B.I.'s investigation of

Burt Andrepont, who was at that time Director of the Port of Lake Charles.

In order to resolve this discovery dispute the court ordered an *in camera* inspection of the tapes in question. On June 20, 1988, as a result of the inspection, the court ordered that two video tapes and two of the audio tapes be made available to the defendants for inspection and copy. These four tapes were deemed by the court to have some possible relevancy to the Government's case in chief and/or the defense thereof. The remainder of the tapes in question were placed under seal pending further orders of the court or the United States Fifth Circuit Court of Appeals. After viewing the four tapes which the court ordered to be turned over, Mr. Carter's position with respect to a conflict of interest apparently did not change.

On July 1, 1988, the court held a hearing on the Government's motion in open court with all defendants and defense counsel present. At the hearing the Government reiterated its reasons in support of the motion set forth in the June 7th letter to Mr. Carter and Mr. Stephens. The Government indicated that it did not intend to call Mr. Carter as a witness in its case-in-chief although there was a slight possibility that the Government may need to call Carter as a rebuttal witness. The Government finally indicated that it did not intend to introduce any tapes depicting Mr. Carter in its case-in-chief.

Mr. Carter argued that unless he was called as a witness, no conflict of interest would be present. He further stated that he would be more than willing to voluntarily withdraw if and when he was called to be a witness in the case by either the Government, his client or by any co-defendant. When asked whether he intended to try to introduce into evidence any of the video and/or audio tapes depicting himself, Carter replied that he did not know at this time but admitted that some of the tapes on which he appeared would be very helpful to the defendants. The court then addressed Mr. Kerlegon who, after being informed by the court of a number of perceived conflicts of interest, indicated that he nevertheless wished to have Wilford Carter represent him and, after being informed of the possible adverse consequences, stated that he desired to waive any conflict.

It was Mr. Carter's contention that the court should not require him to withdraw from the case merely because of a remote possibility that a conflict may develop in the future. Carter asserted that no actual conflict existed and that a conflict was simply being manufactured by the Government. Finally, Mr. Carter contended that to the extent that either an actual or potential conflict did exist, the conflict would be of such a nature that it could be waived by his client Charles Kerlegon. This court cannot agree with Mr. Carter and therefore GRANTS the Government's motion and ORDERS that Wilford Carter be removed as counsel of record in this matter for the following reasons.

Wilford Carter's representation of Charles Kerlegon troubles the court for a number of reasons. However, all of the conflicts or potential conflicts involve the violation or potential violation of either Rule 1.7 or Rule 3.7 of the ABA Model Rules and the Rules of Professional Conduct as recently adopted by the Louisiana Supreme Court. LRS 37: Ch. 4 App.

Rule 1.7 contains the general rule with respect to conflict of interest and reads in pertinent part:

> Loyalty is an essential element in the lawyer's relationship to a client. Therefore ... A lawyer shall not represent a client if the representation of that client may be materially limited by ... the lawyers own interests....

The rule does add two exceptions to the above quoted general rule. They are:

1) where the lawyer reasonably believes the representation will not be adversely affected; and

2) where the client consents after consultation.

The second exception deals with waiver of conflict and will be addressed infra.

The first exception is based upon a lawyer's subjective belief within objective pa-

544

rameters (i.e., reasonableness). While Wilford Carter has made it abundantly clear to this court that he believes any conflicts or potential conflicts would not adversely affect his representation of Charles Kerlegon in this case, this court, after careful consideration of the following perceived conflicts of interest under Rule 1.7, cannot deem Mr. Carter's belief a reasonable one.

With respect to Rule 1.7, the court finds that actual (as opposed to potential) conflicts exist that, standing alone, should be grounds for Mr. Carter's disqualification. Rule 1.7 deals with, among other conflicts, a situation where the attorney's interests conflict with those of his client.

 In this case, as the Government has pointed out, Wilford Carter was a subject of the overall Dock Board Investigation which has resulted in an indictment of the three co-defendants in this case. Moreover, the Government has indicated that it intends to subpoena Charles Kerlegon to testify before the Grand Jury at some future date regarding Wilford Carter's involvement in the Dock Board case. The court must assume that the purpose of such testimony would be to attempt to obtain an indictment against Mr. Carter and/or any other individuals involved with the Dock Board investigation but not yet under indictment.

The mere possibility that such could occur creates an actual conflict of interest between Wilford Carter and Charles Kerlegon. One good example lies in the area of plea bargaining. While it may (or may not) be advantageous for Mr. Kerlegon to reach some compromise with the United States, Mr. Carter's own interest would be most assuredly adversely affected if such were to take place. Any plea bargain would surely include a requirement that Mr. Kerlegon cooperate with the Government and such cooperation may include testifying before a Grand Jury about Wilford Carter's alleged involvement in the Dock Board case. Of course, Mr. Kerlegon may not or should not wish to plea bargain but that does not diminish the conflict. The crux of the matter is that, in making decisions regarding his case (such as whether a plea

bargain might be desirous) Mr. Kerlegon is entitled to consult with an attorney who can give that legal advice with his client's, and only his client's, best interest in mind. Such legal advice could not possibly be given by Mr. Carter in this matter given the above cited circumstances surrounding the case.

On a more general note, the court does not believe that Wilford Carter can give Mr. Kerlegon the kind of client loyalty required by Rule 1.7 in light of the uncertainty as to Mr. Carter's own future which is suggested by Mr. Parker's June 7th letter. The diametrically opposed interests of Mr. Carter and Mr. Kerlegon and the resulting lack of loyalty therefrom would surely affect all areas of Mr. Carter's representation and not simply the ability to effectively plea-bargain.

In addition to the actual conflicts which exist under Rule 1.7, the court finds there exists a number of potential conflicts relating to Rule 3.7.

Rule 3.7 pertains to the lawyer acting as a witness and reads in pertinent part:
(A) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) The testimony relates to an uncontested issue;
(2) The testimony relates to the nature and value of legal services rendered in the case; or
(3) Disqualification of the lawyer would work substantial hardship on the client.

 Mr. Carter does concede that if it becomes necessary for himself to be called as a witness in the case then, and only then, a conflict would arise which would require that he withdraw. Mr. Carter also indicated that if such a situation would develop, he would withdraw voluntarily.

As previously stated, the court inquired into whether any of the parties thought they might call Carter as a witness at trial. The best response the court could obtain was that, although no one could rule out that possibility, it was unlikely that Wilford

Carter would be called as a witness. However, it is much more likely that at least one of the defendants may attempt to introduce one or both of two video tapes (which were ordered by this court to be turned over to the defendants and which depict Wilford Carter) as part of their defense. Mr. Carter admitted in open court that it was his belief that such tapes would be highly advantageous to the defense. Should the tapes be introduced for viewing by the jury and Mr. Carter be allowed to remain in the case, Carter would find himself in a most precarious situation.

Either Carter would have to refrain from commenting upon or referring to the tapes in his witness examination and closing arguments (to the detriment of his client) or he becomes in effect an unsworn witness in the case. Contrary to the view expressed by Mr. Carter, this court finds that unsworn testimony from counsel's podium would be just as violative of Rule 3.7 as if Carter takes the witness stand. Such a situation was discussed in *United States v. Cunningham*, 672 F.2d 1064 (2d Cir.1982), a criminal case, wherein the defendant's attorney (Kennedy) was present during a conversion between a Government witness (McCreery) and his client. The court stated:

> [i]f Kennedy acts as … trial counsel, the effect would be to make Kennedy an unsworn witness. Thus if Kennedy were to cross-examine McCreery, for example, or if in his summation to the jury he were to argue the plausibility of McCreery's testimony or to offer an interpretation of the words attributable to him, he would implicitly be testifying as to his version of the conversation … Since as an unsworn witness he [Kennedy] would not be subject to cross-examination or explicit impeachment, the interest sought to be protected by the Disciplinary Rules would be even more seriously eroded than if Kennedy appeared as a sworn witness." 672 F.2d at 1075.

This court agrees with and adopts the reasoning of the Second Circuit as set forth in *Cunningham*. Wilford Carter is in no better position if he, or counsel for a co-defendant, introduces any of the video tapes on which he appears than he would be if he were actually called as a witness in the case.

Carter will then surely find himself in something of a Catch–22. If he attempts to avoid the conflict under Rule 3.7 by refusing to either introduce or comment on video tapes which he himself has stated would be very beneficial to the defense, then he automatically finds himself in violation of Rule 1.7 because he will then not be representing Mr. Kerlegon in a manner consistent with Kerlegon's best interest. On the other hand, should Mr. Carter act in Charles Kerlegon's best interest as required by Rule 1.7 and use the tapes to their full advantage, he finds himself violating Rule 3.7 as discussed above. Clearly then, whichever route counsel wishes to pursue, Charles Kerlegon suffers.

The above simply illustrates a number of problematic if not impossible situations along with the adverse effects that Mr. Kerlegon would face should Wilford Carter be allowed to remain in the case. With a serious conflict of interest such as this, the list of possible troublesome situations, as well as the list of adverse effects upon the defendant, is virtually endless.

Faced with the above stated situation, it is incumbent upon the court to make a determination as to whether the conflict of interest is sufficient to outweigh the defendant's general right to hire counsel of his own choosing. In addition, since Mr. Kerlegon has had all of these problems explained to him by the court, and nevertheless agreed to waive any conflicts, this court must determine whether Mr. Kerlegon can make an effective waiver so as to allow Wilford Carter to continue his representation.

■ The court possesses the power to disqualify an attorney based upon a conflict of interest under its general supervisory authority over lawyers and litigation before it. *See, Smith v. New Orleans Federal Savings and Loan Ass'n,* 474 F.Supp. 742 (E.D.La.1979) and *Woods v. Covington County Bank,* 537 F.2d 804 (5th Cir.1976).

546

While the court is not unmindful of defendant's right to counsel, the court must find that the exercise of its supervisory powers to disqualify Wilford Carter does not abrogate defendant Kerlegon's Sixth Amendment rights. The Sixth Amendment guarantees each defendant the "assistance of counsel for his defense." This guarantee "contemplates that such assistance be untrammeled and unimpaired." See *United States v. Siegner*, 498 F.Supp. 282, 287 (E.D.Pa.1980) [citing *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942)]. Nevertheless, although the right to counsel is absolute, there is no absolute right to a particular counsel. See *United States v. Wheat*, — U.S. —, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) and *United States v. Dolan*, 570 F.2d 1177, 1181 (3d Cir.1978). As stated in *Dolan:* "Certainly the Sixth Amendment should not be interpreted to allow a defendant to sanction a lawyers breach of ethical duties, when such duties serve the public interest as well as the client's." 570 F.2d at 1183. "When a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the [Rules of Professional Conduct], the court should not be required to tolerate an inadequate representation of a defendant." 570 F.2d at 1184.

Finally, with respect to the issue of Mr. Kerlegon's waiver, the court must in its discretion refuse to accept the waiver as totally incompatable with his own interest as well as the Rules of Professional Conduct. As stated in *United States v. Wheat, supra,* "The District Court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in these rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at —, 108 S.Ct. at 1699.

Were this perceived by the court as simply a potential conflict of interest, or had the court found this case to be a close call, it would have recognized the presumption in favor of defendant's counsel of choice and would likely have allowed Mr. Kerlegon to waive the conflict. However, as demonstrated above, this case is anything but a close call. In view of the serious, blatant and obvious conflict of interest this court finds that a substantial injustice would be done if Mr. Carter were allowed to remain as counsel of record for Charles Kerlegon.

Accordingly, the motion of the United States is GRANTED and Wilford Carter is hereby ORDERED removed as counsel of record on behalf of Charles Kerlegon in the above captioned matter.