**David F. LACE**

v.

**UNITED STATES of America.**

**Crim. A. No. 79-44-1.**

United States District Court,
D. Vermont.

Sept. 6, 1984.
Amendment to Memorandum of Decision
filed Oct. 11, 1984.

Barry E. Griffith, Rutland, Vt., for plaintiff.

Peter W. Hall, Asst. U.S. Atty., Dist. of Vt., Rutland, Vt., for defendant.

## MEMORANDUM OF DECISION

HOLDEN, Senior District Judge.

Following the appeal of his conviction on a negotiated conditional plea of guilty to the charge of conducting a narcotic enterprise in violation of 21 U.S.C. § 848, the petitioner David Lace instituted the present action claiming deprivation of assistance of counsel. On appeal from this court's denial of relief under the provisions of 28 U.S.C. § 2255, 573 F.Supp. 950, the court of appeals returned the cause with directions to focus consideration on the adequacy of the representation afforded by the petitioner's retained counsel, Clifford Steele, Esq., of Atlanta, Georgia, assessed in the light of his lawyer's conflict of interest. *Lace v. United States*, 736 F.2d 48, 50 (2d Cir. 1984).

The roots of the petitioner's constitutional claim that he was denied the right to effective assistance of counsel in violation of the Sixth Amendment, are implanted in the fraternal kinship and professional relationship that prevailed between Clifford Steele, one of his two retained attorneys and Steele's brother Wayne, at the time the petitioner's guilty plea was tendered and accepted by the court on January 2, 1981. In keeping with the gravity of the offense to which the plea was offered, the agreement submitted to the court was carefully conditioned on numerous points favorable to the petitioner. The Government agreed to petitioner's release on bail during the pendency of an appeal that was designed to preserve each and every constitutional issue throughout fourteen days of suppression hearings. The most noteworthy aspect of the plea agreement was its provision that requested the court to impose a sentence not to exceed the ten years minimum term of confinement provided for the offense charged in Count III, to which the plea was offered. The agreement was further conditioned on the dismissal of the remaining counts.

Upon completion of a presentence report, sentence was imposed in accord with the conditional plea agreement on February 25, 1981. The judgment of conviction was affirmed. *United States v. Lace*, 669 F.2d 46 (2d Cir.) *cert. denied* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). On application of Clifford Steele in behalf of the petitioner, the time for his voluntary surrender was enlarged to January 4, 1983.

Clifford Steele continued as counsel for the petitioner and his wife, Libby Lace, in obtaining release on May 23, 1983 of cash bail deposited in the court registry. On May 31, 1983 the present pro se petition was filed. The court appointed experienced and competent counsel under the Criminal Justice Act to represent the petitioner in this action.

The facts which underlie the conviction of David Lace and his codefendants are fully reported in *United States v. Lace, et al.*, 502 F.Supp. 1021 (D.Vt.1980).

The retrospection required in the instant proceeding indicates that the success of the suppression hearings turned out to be the key to the combined strategy of all seven defendants. Over weeks of continuous surveillance of the Sharon distribution point for the controlled substances that culminated in a successful search and seizure of great quantities of contraband, the Vermont State Police had gathered abundant evidence to support the charges made in the federal indictment which followed. The main line of resistance to these accusations was a determined and partially successful assault on the evidence marshalled by the state and federal enforcement officers.

Clifford testified in the proceedings now before the court that many considerations were involved in his advice to the petitioner to join in the written conditional plea agreement which Steele and counsel for his codefendant Ducharme had negotiated with the United States Attorney. Of these the prin-

cipal factor was based on the adverse results of the suppression hearings

> ... as our hoped-for relief didn't materialize. It became less and less of a clear situation that we would prevail on the facts.

Transcript of Hearing, September 12, 1983, at 51–52.

Sufficient evidence survived the suppression hearings to constitute an immediate danger of conviction if the case proceeded to trial without appellate review of the trial court's failure to suppress some of the most incriminating evidence collected during the surveillance and the searches and seizures which followed on May 16, 1979. The plea agreement was designed to achieve this objective.

### Adding Wayne Steele to the Supplemental List of Witnesses

On December 19, 1981, Government attorneys provided defense counsel with a supplemental list of eighteen witnesses which the Government expected to call in the presentation of its direct case. This list was in addition to an earlier list of forty-two witnesses supplied by the prosecution. It included the name of Clifford Steele's brother Wayne. The second listing also included the name of Randy Ducharme of Taunton, Massachusetts, the defendant Roger Ducharme's hometown. Lace's brother Daniel was an indicted co-conspirator.[1]

The trial was scheduled to commence against seven defendants on January 5, 1981. The consultations between Clifford and Wayne, which followed the service of a subpoena on Wayne, gave rise to a claim of privilege by Clifford when he testified in these post conviction hearings. On these facts and circumstances the opinion of the court of appeals held:

> Since Clifford was representing Wayne, who was listed as a prosecution witness against Lace, Clifford had a conflict of interest that precluded his representation of Lace, unless Lace, upon full explanation of the fact and implications of the conflict, explicitly asserted the right to proceed with Clifford as his counsel.

*Lace v. United States, supra,* 736 F.2d at 50.

The rather voluminous record at hand fails to yield any full and explicit explanation afforded to the petitioner by court or his counsel concerning the danger of the conflict of interest that might have attended the relationship between Clifford and Wayne Steele. That is not to say that David Lace was entirely unmindful of the importance that the legal representation of the several defendants should be free from any conflict of interest on the part of the numerous defense attorneys.

During the interval following the court's denial of the various pretrial suppression motions on October 30, 1980, a potential conflict of interest in a different context came to light. It derived from a change of association of Robert Citronberg, Esq., of Atlanta, Georgia, from the law office of Robert G. Fierer, counsel for the petitioner's codefendant Gary Butts, to the Clifford Steele law office. As a consequence

---

1. By letter to the court dated February 12, 1980, Thomas T. Merrigan, Esq. of Greenfield, Massachusetts, counsel for Daniel Lace in Criminal Action 79–44–6, informed the court of a possible conflict of interest resulting from his prior representation of Ms. Lynn Munsinger, who was named on the Government's revised witness list dated January 25, 1980. Later, during the suppression hearings, Thomas Merrigan filed a motion to withdraw as counsel for Daniel Lace on April 28, 1980. This motion was supported by an affidavit from Mr. Merrigan in which he stated that on or about May 1979, "he consulted with Ms. Munsinger with regard to factual matters potentially relevant to the controversy at hand." Affidavit of Thomas T. Merrigan, Criminal Action No. 79–44–6, filed April 28, 1980. It was Mr. Merrigan's professional judgment that he had a potential conflict of interest that violated Canon Four of the American Bar Association's Code of Professional Responsibility.

After hearing on the motion, and upon Daniel Lace's representation to the court that he did not object to the motion, the court granted trial counsel's motion to withdraw as counsel for Daniel Lace. Local counsel for Daniel Lace, Robert P. McClallen, Esq. of Rutland, Vermont, continued alone in the representation of this defendant for the remainder of the proceedings.

of this development the court directed the clerk to notify the defense counsel involved to appear at Rutland to enable the court to make inquiry into the possible conflict of interest concerning Mr. Citronberg's past employment by the Fierer office and his then association with Clifford Steele.

In response to this direction by the court, David Lace on December 16, 1980, submitted his written statement under oath. The petitioner's affidavit demonstrates his full understanding of the problem, explaining he had no objection to Fierer's continued representation of Butts, who was named with him in the indictment. The affidavit concludes:

It is further your deponent's position that he has no objection to Mr. Citronberg working in this capacity and that insofar as your deponent is concerned, there has not been, is not and cannot be any possible or potential conflict of interest vis a vis Mr. Citronberg and your deponent.

That your deponent makes this election and waiver knowingly after full discussion of the facts of this matter with your deponent's attorney, Mr. Steele.

Affidavit of David F. Lace filed December 19, 1980.

The affidavit was presented to the court on December 19, 1980, at the time appointed for the hearing. The waivers submitted by the persons concerned obviated the necessity for exploring the possible conflict involved in the Citronberg employment by further hearing. However, Clifford Steele then requested the court to consider another matter, a *Motion in Limine*, which he presented at the time of the scheduled hearing on December 19. The motion requested an order precluding the Government or any of its attorneys and witnesses from mentioning the name of Wayne Steele, urging that such reference could bring about embarrassment and possible prejudicial inference connecting Wayne to petitioner's counsel Clifford Steele.[2]

The Government agreed that there was no relevance in the blood relationship between Wayne Steele and petitioner's counsel. The Government attorney indicated, however, that Wayne might be shown to be an unindicted co-conspirator. The prosecution resisted any effort to restrict its proof of Wayne's participation if it became relevant. The court was assured that the prosecution would not introduce any evidence tending to connect Wayne Steele with petitioner's counsel. In the event the Government's proof might implicate Wayne Steele in some relevant manner, it would not be offered without notice to counsel and consideration by the court out of the presence of the jury. Clifford Steele indicated he was satisfied with this resolution.

There was no specific indication prior to December 19th to petitioner's counsel of the expectation that Wayne would be added as a possible witness for the prosecution. The question of Clifford's conflict of interest, by way of his professional and blood relationship with Wayne Steele, was left unattended at the December 19th hearing. It remained unnoticed by the court through the change of plea proceedings which followed on January 2, 1981.

Of course how Clifford Steele would have performed at trial had his brother Wayne been called as a Government witness is unknown. That fact, along with the nature and extent of Wayne's involvement in the Lace-Ducharme organization was foreclosed by negotiated pleas of the principal participants.

The evidence presented in the first hearing on the post conviction petition establishes that Lace never explained to his counsel, Clifford Steele, the nature and ex-

---

**2.** Clifford Steele's fear on this score was not unfounded. He testified that the Special Agent of the Drug Enforcement Administration had previously concealed his identity and had made harassing telephone calls to Steele's law office in Atlanta. The ruse was an apparent attempt to obtain information from Steele's secretary in an effort to identify various coded telephone numbers found in Roger Ducharme's notebook that was seized on May 16, 1979. Further, during the agent's cross-examination by Clifford Steele, the agent spontaneously interjected reference to Wayne Steele as the cross-examiner's brother.

tent of Wayne's involvement with the Lace-Ducharme organization. Lace testified that Clifford would have been very surprised to find out about Wayne's involvement. Lace testified Clifford asked him "Did you guys [Lace and Ducharme] really supply that coke Wayne got busted with?" Lace responded "No."

Later Lace testified that both he and Ducharme knew of Wayne's involvement with Roger Ducharme; he didn't think Clifford was aware of Wayne's transactions with Ducharme. Lace failed to communicate his knowledge of Wayne's dealings to his attorney.

Clifford Steele testified in these proceedings that if Wayne were called as a proper witness, Clifford would have to make an application to withdraw as Lace's attorney. He went on to explain: "I think the only thing that would have been prejudicial to Mr. Lace would have been the existence of the fact that Wayne Steele and I are brothers, and nothing else." Direct examination of Clifford Steele, transcript of hearing, September 12, 1983, at 32.

Clifford Steele testified that from his inquiries of his client Lace, conversations with his brother, consultations with the Government, as well as evidence developed throughout the weeks of suppression hearings, he had no knowledge of anything that could have been adduced through his brother Wayne that would be harmful to Mr. Lace.

The petitioner testified he had no contact with Wayne Steele after Steele was convicted in 1978. When Clifford asked Lace about Wayne as a possible witness for the prosecution, Lace responded that Wayne couldn't "bury us," but added such testimony wouldn't help either. The Government suggested at the December 19th hearing that Wayne Steele's connection with the Lace-Ducharme partnership was by way of an employee relationship as one who may

have been supervised or directed by one or both partners.

In any event, in retrospect at this point in time, it is now clear enough that the facts and circumstances that were made known to the court at the December 19th hearing called for some further inquiry. Although Clifford had not undertaken to represent more than one accused defendant, the Government suggested Wayne could be regarded as an unindicted co-conspirator. Despite the fact that Wayne was not a codefendant and neither the prosecution nor defense counsel raised the conflict issue, it now appears that caution should have led the court to directly alert the petitioner to the danger of the possibility of divided loyalties on the part of his chosen trial counsel. *United States v. Curcio*, 680 F.2d 881, 888 (2d Cir.1982). And it now appears that David Lace should have been made fully aware of the

... conflict of two constitutional rights, to wit, the right of a criminal defendant to be represented by counsel of his own choice and the right of such a defendant to counsel whose effectiveness is unimpaired by divided loyalty.

*United States v. Curcio*, 694 F.2d 14, 22 (2d Cir.1982).

On January 2, 1981, the petitioner and Ducharme joined in offering conditional pleas of guilty. Gary Butts, who was joined with Lace and Ducharme in Count I, charged with possession with intent to distribute 457 pounds of hashish and 100 pounds of marijuana, entered a plea of guilty to this count on December 30, 1980. The codefendant David Southam pleaded guilty to conspiracy on January 2, 1981. The defendants Patricia Eckman and Glen Pollack both pleaded guilty on January 6, 1981.[3]

### *The Sentence Hearing*

Reconsideration of the adequacy of the assistance of counsel provided David Lace

**3.** The two remaining persons accused in the indictment were in fugitive status. The defendant Roger Ducharme failed to voluntarily surrender following the affirmance of his conviction on appeal and is presently regarded by the Government to be a fugitive. The benefit of

hindsight indicates that the condition of the plea agreement that permitted Ducharme liberty on bail pending his appeal was improvidently approved by the court at the time of his sentencing on February 25, 1981.

in the light of Clifford Steele's conflicting interest brings into focus the content of the presentence report submitted by the chief probation officer prior to the sentence hearing on February 25, 1981. This document, consisting of thirteen pages, makes a brief reference to Wayne Steele's involvement under the heading PROSECUTION VERSION:

> In early 1978, Wayne Steele was arrested in this district on charges of distributing cocaine. He was subsequently convicted. There were strong indications that he was tied in with the Bailey-Rawson House, and also information that he had previously been a large scale marijuana dealer. This further dovetailed with intelligence information about David Lace and others. In its Bill of Particulars of January 1980, the government was to contend that Wayne Steele, among others, had run a "stash house." [4]

> .    .    .    .    .

At various times during this case there were apparently 12 to 15 stash houses, including ones in Andover Ridge, Ludlow, Quechee, Killington, Weston, Sharon, Benson, and Echo Lake, Vermont.

*Defendant's Version:*

At the instruction of counsel, the defendant declined to discuss the case.

The sentencing data for the year 1980 contained in the report submitted by the Probation Office to the petitioner, his counsel, and the court prior to the sentence hearing reported nine defendants who were sentenced in the United States for continuing criminal enterprise violations under 21

**4.** The portions of the Bill of Particulars, filed January 18, 1980, that refer to Wayne Steele are these:

*Count 2*

*    *    *    *    *    *

During the course of the conspiracy when the marijuana and hashish were trucked into Vermont, the substances were taken to houses and/or buildings (referred to as 'stash houses') owned, rented or otherwise under the control of certain named members of the conspiracy and others, including ROGER DUCHARME, DUNCAN MacNAMEE, GARY BUTTS, WAYNE STEELE and KENNETH SCHRAGER.

U.S.C. § 848. Of these, only one convicted person was sentenced to the minimum of ten years imprisonment; three received thirty-year sentences. The remaining sentences imposed ranged from fifteen to fifty years. The average sentence was 24.1 years.

The full context of the presentence report was made available to the petitioner and his counsel. At the hearing both the accused and counsel informed the court they had read the report and had gone over it together and in detail. Both were given the opportunity to make changes or corrections. Mr. Steele's only comment concerned his client's financial situation. When the court inquired of Mr. Lace if he had any suggestions for corrections or amendments, he replied in the negative. Later he explained his answer:

> I agree with the government's, you know, personal history, my background, but I don't agree with the conclusion of the investigation of all the report. (Record of sentence hearing, page 1–7.)

The petitioner declined to exercise his right of allocution. No reference was made by the prosecution or defense counsel concerning that aspect of the Government's version of the case that involved Wayne Steele. The sentence hearing in the case of the *United States v. Roger Ducharme*, Cr. No. 79–44–1, was held at the time of David Lace's sentencing on February 25, 1981.

### The Continuing Criminal Enterprise Charge

The evidence presented during the course of the suppression hearings was

*    *    *    *    *    *

*Count 3*

*    *    *    *    *    *

DAVID LACE and ROGER DUCHARME occupied positions of organizer, supervisor or manager with respect to at least five of the following persons: GARY BUTTS, PATRICIA ECKMAN, DAVID SOUTHAM, DANIEL LACE, JOHN RADZIKOWSKI, PAUL RYZEWIC, GLENN POLLACK, DUNCAN MacNAMEE, KENNETH SCHRAGER, WAYNE STEELE. From their continuing operation DAVID LACE and ROGER DUCHARME made hundreds of thousands of dollars and perhaps over a million dollars.

clear and convincing in its persuasion that the petitioner was engaged in a continuing criminal enterprise in which he and Ducharme committed a serious narcotic violation in concert with at least five others. Indeed, five others were convicted of such participation by pleas of guilty before the time scheduled for trial. The profits derived from the enterprise were highly lucrative involving multi-ton importations of marijuana and hashish.[5] When Lace and Ducharme were arrested $185,000 in currency was found in the trunk of the Lace vehicle in which the partners drove to the Sharon house. At the time the search warrant was executed approximately 457 pounds of hashish and 100 pounds of marijuana were seized.

Following the petitioner's arrest on May 16, 1979, one of the arresting enforcement officers inquired of the petitioner if he would be willing to cooperate with the state police. The petitioner responded that he would be more inclined to aid the "feds." Lace then went on to say that if he decided to cooperate, he "could probably give names of judges, attorneys, members of the Coast Guard...." While he made no disclosure, he suggested further communication with the state trooper. According to testimony at the suppression hearing, Lace suggested to the state police they had "apprehended the biggest people in Vermont...." *See United States v. Lace, supra,* 502 F.Supp. at 1033.

The petitioner's testimony at the second hearing on July 19, 1984, on the issue of petitioner's involvement with the Lace-Ducharme organization, can be simply stated. His testimony on this occasion was offered in support of his present claim that he did not exercise managerial or supervisory responsibilities. He urges that but for Clifford Steele's advice, he could have successfully defended the continuing criminal enterprise charge.

David Lace testified that he began working with Roger Ducharme in the sale and distribution of marijuana sometime in 1975 or 1976. David Lace financed the operation by initially putting down $15,000 to $20,000. The source of these funds was a check from his mother. David Lace understood his relationship to the organization to be that of a silent partner. Lace put up money, while Roger Ducharme managed the day-to-day operations. Lace testified that he wanted to involve Roger Ducharme as a partner to remove himself from the hands-on operation.

Lace testified that he had a substantial sum of money invested in the organization and knew the generalities of what was going on but that there were certain specifics about which he was unaware. Roger kept the books, but Lace had full access to them. Lace indicated that he never gave the workers any money directly, or told them what to do. However, the workers knew that Lace would stop by occasionally.

Lace also testified concerning several multi-ton marijuana deals which he and Roger conducted as partners. Lace told the court about eight or nine deals which were in the five to seven ton range. About half of these deals were successful, according to Lace, and resulted in profits of between $50,000 to $100,000 on each transaction that succeeded.

The main theme of the petitioner's testimony was that he always intended to proceed to trial on Count III of the indictment, the count alleging a violation of 21 U.S.C. § 848. The petitioner testified that he persisted in his belief that he would be acquitted on the continuing narcotic enterprise charge, although he expressed the belief

---

5. Following the May 16, 1979 seizure of contraband and records maintained by the Lace-Ducharme enterprise, the Internal Revenue Service ("IRS") imposed jeopardy termination assessments under 26 U.S.C. § 6851. By separate actions that were later consolidated for hearing, Lace and Ducharme, acting under 26 U.S.C. § 7429(b), obtained judicial review by the court of the reasonableness of the assessment made by the IRS. *Lace v. United States,* No. 79–174 and *Ducharme v. United States,* No. 79–175 (D.Vt. October 9, 1979). The court's opinion is reported beginning at page 80–367 of Volume 45 of the American Federal Tax Reports (Prentice-Hall), Second Series. These proceedings report the extent and nature of the operations viewed by the IRS for the purpose of making jeopardy assessments.

that his associate Ducharme would be found guilty. Lace maintained at the second hearing that he was dissuaded from going to trial at the urging of Clifford Steele, his codefendant Ducharme and Ducharme's counsel, Paul Cambria.

### Conclusion

■ Although no trial took place, the court is called upon to determine whether the conflict of interest that prevailed at the time of Lace's negotiated plea adversely affected Clifford's performance in counseling the plea and the conviction that followed. *E.g., United States v. Cronic,* — U.S. —, —, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984); *Strickland v. Washington,* — U.S. —, —, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980); *Lace v. United States, supra,* 736 F.2d at 50. A convicted defendant claiming ineffective assistance of counsel is called upon to point out the deficiency in his representation that resulted in an unconstitutional deprivation. *Strickland v. Washington, supra,* — U.S. at —, 104 S.Ct. at 2065; *Cuyler v. Sullivan, supra,* 446 U.S. at 349, 100 S.Ct. at 1718; *Lace v. United States, supra.* The petitioner must show that his counsel's assistance was below "an objective standard of reasonableness." *Strickland v. Washington, supra,* — U.S. at —, 104 S.Ct. at 2063.

■ The present question for decision is whether the representation afforded the petitioner by his retained counsel, Clifford Steele, constituted reasonably adequate assistance measured by prevailing professional standards. The court's review of the total record of the conviction now challenged is undertaken with full appreciation of the potential conflict of interest that forms the root and stock of the petitioner's request for relief.

The opinion by Justice O'Connor in *Strickland v. Washington, supra,* instructs that

[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

— U.S. at —, 104 S.Ct. at 2066.

The petitioner has failed to identify the acts or omission on the part of Clifford Steele other than to say that the addition of Wayne's name to the extended list of witnesses expected to be called was a factor in Lace's conditional plea. Clifford testified that there were many considerations involved in his counseling Lace to enter the negotiated plea. The witness explained it was a heavy decision but the addition of his brother's name to the witness list was not a contributing factor "... that entered into it at all. I kept that separate, ... I believe these two things were quite independent and one did not have any relationship to the other." (Tr. p. 45, Hearing, September 12, 1983).

Petitioner's able assigned counsel urges that such a nexus is not required in the light of *United States v. Cancilla,* 725 F.2d 867 (2d Cir.1984). Here the Government has assumed a fact which the court of appeals has held, namely, that Clifford Steele's representation of Lace was in conflict with his counseling of his brother Wayne, who had been served with a subpoena by the Government. The petitioner

urges that an actual lapse of representation has been established even in the absence of a full explanation of the fact and implications of the conflict. Apparently relying on *Lace v. United States, supra,* 736 F.2d at 50, he contends that an express waiver of his right to other counsel and an explicit election to proceed with Clifford in the face of the conflict inherently renders Steele's assistance ineffective and unconstitutionally defective.

It is perhaps unfortunate in the interests of protecting the integrity of the carefully negotiated plea agreement in this case that David Lace was not offered the option of continuing with Clifford or electing to proceed to trial with co-counsel alone or other counsel of his choice. No motion was presented to the court to engage the potential problem. That is not to say the petitioner was unaware of the danger of conflicting interest residing in the change of Citronberg's employment. Also, his attention was drawn to the problem in the case of his brother David's attorney. The adding of Wayne Steele's name on the Government's supplemental list of witnesses did not sufficiently attune the court to the danger to stimulate action of its own initiative to probe the potential conflict.

■ Unlike the situation that confronted the court in *United States v. Cunningham,* 672 F.2d 1064 (2d Cir.1982), the Government and the accused were either unaware of the conflict or willing to leave it at rest. The right of a defendant "who retains counsel to be represented by that counsel is 'a right of constitutional dimension.'" *Id.* at 1070. The right of an accused to the undivided loyalty of his attorney is of equal constitutional dimension. *United States v. Curcio, supra,* 680 F.2d at 888.

The court's opinion in *Cunningham* teaches that Sixth Amendment rights are "... too important to be denied on the basis of a mere, though substantial, possibility." 672 F.2d at 1075. These words were written by Judge Kearse on a constitutional claim with underpinnings based on the prospect of evidence to be presented by a witness which the prosecution intended to call. It is so here. In the event the Government decided against calling Wayne Steele, Lace's present claim would be illusory and vanish.

To be sure, speculation has suggested that Clifford Steele's recommendation that the petitioner join in the plea agreement with his co-partner Ducharme was the product of disloyalty to Lace in preference to loyalty to the interests of his brother Wayne, who was also his client. The antagonism between these competing loyalties is without substantial evidentiary support. Neither is the court persuaded that the mere possibility of conflict is so fraught with danger that standing alone in isolation, the mere possibility of conflict impairs the validity of the conditional negotiated plea agreement that underlies the conviction presently challenged.

The petitioner's claim of deprivation of counsel has a different bearing than that advanced in *United States v. Cancilla, supra.* There, without disclosing the details, it was assumed by the Government that counsel for the defendant might have engaged in criminal activity related to the charge for which the defendant was convicted, and it further was conceded that the defendant knew nothing of his counsel's criminal activities. The court, in an opinion by Chief Judge Feinberg, held that the conflict was sufficient of itself to invoke the per se rule of *Solina v. United States,* 709 F.2d 160 (2d Cir.1983). The key consideration in both *Cancilla* and *Solina* is that a criminal defendant is entitled to be represented by an attorney who is free from the constraint of criminal activity on the part of defense counsel.

In the case at hand, there is no suggestion by the petitioner, nor from the prosecution, that Clifford Steele had engaged in criminal conduct. There is only the suggestion by Lace that his attorney's brother had exposure to Lace-Ducharme activity. As to this, David Lace admitted he failed to inform his attorney of the extent of Wayne Steele's involvement.

At the close of the recent evidentiary hearing the Government represented that while there was some reason to add Wayne Steele to the supplemental witness list, Wayne's involvement was only tangential as to David Lace. Further, the prosecution took the position that Clifford Steele was unaware of the reason why the Government expected to call his brother as a witness. This is confirmed by the petitioner's testimony at the initial post conviction hearing that he had not disclosed to Clifford the extent of Wayne's connection with the Lace-Ducharme enterprise.

Despite the shortcomings in the record brought into focus by retrospective consideration of the conflict, the court is not persuaded that the assessment made by petitioner's counsel, that his brother would not be presented as a witness at trial, was incorrect despite the absence of a full commitment by the prosecution on the point. If counsel's analysis of this possibility was faulty, it was of insufficient gravity to undermine the validity of the plea now under attack. In the Court's opinion in *Strickland, supra,* it is written:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

> The same principle applies to a capital sentencing proceeding such as that provided by Florida law. We need not consider the role of counsel in an ordinary sentencing, which may involve formal proceedings and standardless discretion in the sentencer, and hence may require a different approach to the definition of constitutionally effective assistance.

*Strickland v. Washington, supra,* —— U.S. at ——, 104 S.Ct. at 2064.

Although Clifford Steele's representation of the petitioner cannot be measured in the framework of a trial on the merits, the three weeks of hotly contested suppression hearings are sufficient to demonstrate that counsel's performance was not impaired by his fraternal and professional relationship with Wayne. Although the plea agreement expressly limited the "standardless discretion" of the court to the minimum sentence provided in 21 U.S.C. § 848, this tactic cannot be blamed as faulty. On the facts then available, apart from any evidence that Wayne might have provided, the Government's evidence presented through the protracted hearings was highly persuasive of guilt.

More importantly, on the issue of divided loyalty David Lace testified he did not make full disclosure of Wayne Steele's involvement with the Lace-Ducharme enterprise. At the hearing on July 15, 1983, in response to an inquiry by the court, the petitioner responded that at the time of his change of plea: "I don't believe Cliff at the time understood how much marijuana and hashish Wayne was selling at various times...." David told the court that he knew the extent of Wayne's involvement, but he didn't tell Clifford about it.

At the second hearing the Assistant United States Attorney represented to the court that while the Government "had a valid basis for bringing Wayne Steele in, but we would say that Clifford Steele didn't know about it." At the time of the hearing on December 19, 1980, as shown in the margin, the prosecution had not decided to call Wayne as a witness, even though his name had been added to the supplemental witness list.[6]

6. MR. HALL: The government has not any record of what Wayne Steele would testify to. He did not appear as a witness before the grand jury. I assume that he would have asserted a privilege to testify and the government would have been forced to make a decision, I think we argued that earlier, as to whether to grant him immunity or just not call him as a witness in the case. But it seems to me based on what David Lace has said, he had relevant information. The question, though, is whether that—the substance of that knowledge was ever conveyed to Clifford Steele, and every indication is that it was not. Because there was no—Clifford Steele knew of no reason that David—that Wayne Steele would be called to testify. I'm saying, your Honor, there was certainly a good faith basis. There are a number of cases, as I'm sure the Court is aware, where there may be key peo-

Any compromise of counsel's duty to avoid conflict of interest must be shared by his clients—the petitioner and Wayne Steele. Both apparently had actual knowledge of the latter's involvement beyond that which they imparted to the counsel they shared.

The court's revisitation of the conflict of interest issue with the benefit of the enlightenment shown in *Lace v. United States, supra,* 736 F.2d at 49, has failed to uncover any evidence that petitioner's retained counsel opposed the interest of David Lace to protect his brother.

Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

*United States v. Cronic, supra,* —— U.S. at ——, 104 S.Ct. at 2046.

■ To establish a violation of the Sixth Amendment, a defendant who has raised no objection at trial must establish that counsel's active representation of the opposing interest adversely affected the assistance he provided the accused. *Cuyler v. Sullivan, supra,* 446 U.S. at 349, 100 S.Ct. at 1718; *Dukes v. Warden,* 406 U.S. 250, 257, 92 S.Ct. 1551, 1555, 32 L.Ed.2d 45 (1972); *Lace v. United States, supra,* 736 F.2d at 49.

How Clifford Steele would have cross-examined his brother, had the prosecution decided to call Wayne Steele as a witness, is, of course, unknown. The second evidentiary hearing has demonstrated that dan-

ger was remote at best. While that eventuality did not come to pass, there has been no showing in the record that the danger of that consequence impaired counsel's fidelity to the interests of the petitioner.

The conditional plea agreement was carefully constructed by experienced defense counsel and the United States Attorney. In the absence of evidence that the conflict of interest exerted an adverse impact on the solemn undertaking negotiated by Clifford Steele and the United States Attorney, the conditional plea must stand. The relief requested in the petition must be denied.

It is SO ORDERED.

## AMENDMENT TO MEMORANDUM OF DECISION FILED SEPTEMBER 6, 1984

The petitioner's appeal from the denial of post-conviction relief pursuant to 28 U.S.C. § 2255, filed September 3, 1981, was withdrawn without prejudice by stipulation of counsel. The agreement was designed to enable the court to hear and determine the Government's motion under Rule 59(e), F.R.Civ.P., to amend the facts reported in the court's most recent decision. The court concludes that the Government's request is well founded. Accordingly, the following facts are added to supplement those stated in the Memorandum of Decision, Cr. No. 79–44–1 (filed September 6, 1984):

During the extended course of the pretrial hearings, prior to the petitioner's con-

---

ple who have information that we don't even come in contact with until the time of trial but are aware that they might have information or develop further. I don't recall and I'm not purporting to testify why it is at that point that in Ms. McAndrew's letter to the attorneys his name was added. The holding action, in essence, on December 19 at the hearing at page 41 of the appendix was an effort on the government's part just to say, 'Please don't limit us in a ruling today because the name may come in and we don't want to be precluded from suggesting—offering evidence to the jury on the issue of guilt or innocence with regard to persons associated with and as workers in the operation.' That's where that came up in the hearing.

\* \* \* \* \* \*

MR. HALL: And I think Mr. Steele was clearly aware of that and we accept the explanation that he gave to the Court. We feel we had a good faith basis for at least making Wayne Steele available to us here in Rutland to see what it was he was willing to say. We believe, based on what Mr. Clifford Steele has said today, that Wayne Steele wasn't entirely forthright with his brother for certainly understandable reasons about the nature of his relationship to the Lace and Ducharme operation.

Excerpts from Hearing on Section 2255 Petition, July 19, 1984, in Rutland, Vermont.

viction on January 2, 1981, there was no evidence nor notice presented to the court to indicate that Clifford Steele's fraternal relationship with Wayne Steele included a current professional connection as his brother's attorney in this or any related proceedings. Other than the Steele kinship, there were no facts then at hand to focus attention on any conflict of interest to impair Clifford's representation of the petitioner in the negotiated plea which followed.

The court had been previously made aware of the fact that Wayne Steele was the brother of petitioner's chief counsel. There was no suggestion made during the extended pretrial proceedings that Clifford had undertaken to advise his brother concerning any facts or circumstances which formed the basis of the criminal prosecution of David Lace.

At the time of the hearing on December 19, 1980, the court was not informed that Wayne Steele had been identified as a potential witness for the prosecution. Clifford Steele testified in the present post-conviction hearings that he had not received the letter mailed from the United States Attorney's office in Burlington on December 18, 1980, which included Wayne Steele as a witness, until after he returned to his office in Atlanta.

During the hearing on December 19th the court's concern was directed only to the problem that might arise if the kinship of Clifford and Wayne Steele should surface at the impending trial. The relevance of any reference to Wayne Steele was challenged by the defendant. The more aggravated problem of the prospect of Wayne Steele's being called as a witness for the Government was not discussed nor dealt with at that time. The impact of the designation of Wayne Steele as a witness in the context of conflicting interests in Clifford's representation of the petitioner was left unattended. The guilty plea left the matter at rest until the instant proceedings were undertaken.