**UNITED STATES of America,**

v.

**Marcos MORRELL–CORRADA, Defendant.**

**No. CR.04–160(PG).**

United States District Court, D. Puerto Rico.

Oct. 25, 2004.

Edgar R. Vega–Pabon, Vega Pabon, Rodriguez Encarnacion & Lopez Covas, San Juan, PR, for Rene Vazquez–Botet (1), Defendant.

Ruben Gonzalez, Rio Piedras, Francisco Rebollo–Casalduc, Francisco Rebollo Casalduc Law Office, San Juan, PR, Octavio M. Rivera–Bujosa, Rivera Bujosa Law Office, Urb. Villa Flores, Ponce, PR, for Marcos Morell–Corrada (2).

Mary K. Butler, U.S. Dept of Justice Public Integrity Section, Matthew C. Solomon, U.S. Department of Justice, Criminal Division, Public Integrity Section, Washington, DC, for USA, Plaintiff.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

On July 15, 2004, the government filed a sealed motion to disqualify defense counsel, alleging a conflict of interest between defense counsel and a former client who testified before the grand jury and who will also testify as a government witness at trial. (Docket No. 55) Defendant filed a response, asserting no conflict and waiver of the attorney-client privilege. (Docket No. 69) The government filed a reply (Docket No. 84), defendant a surreply (Docket No. 91), and the government a response to the surreply. (Docket No. 100)

The Court ordered the government to produce under seal a transcript of the witness' grand jury testimony and transcriptions of the witness' interviews with the government. (Docket Nos. 70, 98, 102) The Court further ordered witness' current counsel to file an affidavit recounting to the best of his recollection the circumstances of the referral from former counsel. (Docket Nos. 70, 97) Upon review of the motions, the transcriptions, the affidavits, and the record of the case, and it appearing that there is neither a conflict of interest nor a serious potential for conflict, the Court hereby **DENIES** the government's motion.

### BACKGROUND

This issue originated in a sealed motion filed by the government. The response, reply, surreply, and the response to the surreply were also filed under seal. Consistent with the secrecy that attaches to grand jury matters, court orders relating to this inquiry were issued under seal. To preserve that confidentiality, the Court utilizes fictitious names for all affected parties and furnishes only the necessary background facts. *See In re Keeper of Records*, 348 F.3d 16, 19 (1st Cir.2003) (substituting fictional names in opinion pertaining to grand jury matter).

In October of 1995, Mr. X was among the contractors selected by the Puerto Rican government to build the SuperAqueduct. (Mot. at 2, of Docket No. 55) Mr. X made clandestine payments in connection with the construction. *See id.* at 3. By late 2001, after completing his work on the SuperAqueduct, Mr. X learned that federal law enforcement was interviewing persons involved in the project. *Id.* At that point, Mr. X sought legal representation and was referred to Attorney A. *Id.*

Mr. X met with Attorney A at the latter's law offices three times for a series of initial consultations. *Id.* at 3–4. At their third and final meeting, it was discussed

whether Mr. X would require Attorney A's representation. *Id.* at 4. Mr. X indicated that he intended to cooperate with the authorities, and it was agreed that he would need another attorney to represent him in his cooperation agreement. Afterward, Attorney A referred Mr. X to Attorney B, who continues to represent him. (Attorney B Aff. at ¶¶ 2–3)

Mr. X negotiated an immunity agreement with the government. (Resp. to Surreply at 3, of Docket No. 100) In August and October of 2003, he was debriefed by the government. (Exs. A, B, C of Docket No. 106) On October 30, 2003, Mr. X testified before a federal grand jury. (Ex. H of Docket No. 82) On April 8, 2004, a federal grand jury returned an indictment charging defendant with multiple crimes relating to the SuperAqueduct project. Defendant was represented by another attorney at arraignment, and on April 15, 2004, Attorney A entered an appearance as his attorney of record. (Docket No. 17)

On April 30, 2004, the government arranged a meeting with Mr. X, "to determine whether the scope and general categories of information conveyed established an attorney-client relationship in this matter." (Reply at 4, of Docket No. 84) On that date, a government attorney (hereinafter "Trial Attorney") and others debriefed Mr. X, in the presence of his lawyer. (Ex. B at 1, of Docket No. 82) No reservation of any rights was made. Trial Attorney took extensive notes during the debriefing, which detail the events of the consultation meetings between Attorney A and Mr. X. *Id.* All the annotations relate to the SuperAqueduct or whether Attorney A would be retained, and no mention is made of any of other subject, including defendant. Trial Attorney's affidavit submitted with the notes states, "although not reflected in my notes, I recall asking [Mr. X] if he talked about [defendant] with his

prior counsel. . . ." My best recollection is that he answered: "Remember I did not know about him." (Trial Attorney Aff., Ex. B at ¶ 3, of Docket No. 82)

Subsequently, in a letter dated May 5, 2004, Trial Attorney requested Mr. X sign a waiver of the attorney-client privilege between himself and Attorney A, "for the limited purpose" of permitting Attorney A to disclose to the government "any and all information concerning me in his control. . . ." (Ex. C, of Docket No. 82) Mr. X refused to sign the waiver, stating that cross-examination by Attorney A "may expose sensitive information not related to this case" and that "it would be against his best interest to waive additional information. . . ." (Ex. D at ¶ 2, of Docket No. 82) The government filed its motion to disqualify on July 15, 2004. (Docket No. 55) Mr. X did not join the motion.

The government argues that Attorney A should be disqualified because his representation of defendant creates a conflict of interest with his former client, Mr. X. (Mot. at 7, of Docket No. 55). The government further argues that Mr. X's refusal to waive his attorney-client privilege should preclude Attorney A from cross-examining him (*id.* at 11), that defendant has a right conflict-free counsel (*id.* at 13), and that the "appearance of impropriety" coupled with the public interest should preclude Attorney A from representing defendant. (Reply at 16, of Docket No. 84)

In opposition, defendant asserts his right to counsel of choice (Resp. at 28, of Docket No. 21), and argues that there is no conflict because no information regarding defendant was learned in the prior representation. (*Id.* at 21) Defendant also argues that there has been a waiver of the attorney-client privilege by Mr. X (*id.* at 7), and that the motion for disqualification manufactures a conflict. (*Id.* at 32–33)

## DISCUSSION

The principal issue before the Court is the extent to which a criminal defendant is entitled to be represented by counsel of his own choice, despite government allegations that said counsel should be disqualified on account of conflict of interest. The Sixth Amendment to the Constitution guarantees that "in all criminal prosecutions the accused shall enjoy the right. . . to have the Assistance of Counsel for his defence." Comprehended by the Sixth Amendment is the right to select and be represented by one's counsel of choice, in whose favor there is a presumption. *See Wheat v. U.S.* 486 U.S. 153, 159–60, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). This presumption favoring a defendant's counsel of choice "may be overcome not only by a demonstration of actual conflict, but by a showing of serious potential for conflict." *Wheat v. United States,* 486 U.S. at 164, 108 S.Ct. 1692 (1988).

Under this standard, "the evaluation of the facts and circumstances. . . must be left primarily to the informed judgment of the trial court." *Id.* While a district court has broad discretion to limit the exercise of the right to counsel of choice when insistence upon it would. . . interfere with the ethical and orderly administration of justice, the "disqualification of. . . counsel should be a measure of last resort." *In re Grand Jury Proceedings,* 859 F.2d 1021, 1026 (1st Cir.1988). Accordingly, the government bears a "heavy burden" in demonstrating that disqualification is justified. *Id.*

### A. Conflict of Interest with Former Client

The district court has the duty and responsibility of supervising the attorneys who appear before it. *Kevlik v. Goldstein,* 724 F.2d 844, 847 (1st Cir.1984). The standards for the professional conduct of attorneys in the U.S. District Court for the District of Puerto Rico are the Model Rules of Professional Conduct adopted by the American Bar Association, as amended. *See* Local Rules Dist. P.R. R. 83.5(a); *see also* 28 U.S.C. § 332(d) (2004) (charging judicial council of each circuit with responsibility to review and abrogate local rules inconsistent with the rules prescribed by the Supreme Court).

The Model Rules contemplate a continuing duty to former clients. *See* Model Rules of Professional Conduct Rule 1.9(a) (2003).

"A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives consent in writing."

*Id.* Thus, the Model Rule 1.9(a) definition of former client conflict, in the absence of written consent, is comprised by two separate required elements: (1) a substantially related matter *and* (2) materially adverse interests.

In the case at bar, "material adversity" is the determinative element in a finding of no conflict. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 99–415 (1999) ("The Committee is of the opinion that only direct adversity of interests meets the threshold 'material adversity' sufficient to trigger the prohibitions established in Rule 1.9."). "There must be a direct link between the clients of an attorney—or at least some concrete evidence that one client, such as an immunized witness, has information about another client. . . before the right to counsel of choice is barred by disqualification." *In re Grand Jury Proceedings,* 859 F.2d 1021, 1026 (1st Cir.1988).

The government contends that there is a conflict or a potential for conflict because as an immunized witness cooperating with the government, former client Mr. X "has provided relevant, admissible and incriminating testimony *against* defendant...." (Mot. at 7, of Docket No. 55) [emphasis added] The government further argues that the indictment specifically alleges that Mr. X was victimized by defendant (*id.*), and that therefore the interests "are not only materially adverse, they are diametrical." (*Id.* at 9.)

This analysis, however, grossly tergiversates the facts. Mr. X's anticipated testimony is adverse to defendant only in the sense that the indictment charges a conspiracy, in which defendant is allegedly involved. In his grand jury testimony, Mr. X made no mention whatsoever of defendant. (*See* Ex H, of Docket No. 82) Furthermore, there are only three references to defendant in Trial Attorney's notes of the debriefings with Mr. X. The first reference dates from October 28, 2003, when Mr. X stated that he had never heard of defendant. (Ex. A at 6, of Docket No. 106) The following day, Mr. X informed that, "he [defendant] had a bad reputation in PR—he [Mr. X] knew he was a party official, papers talked bad about him." (*Id.* at 27) Most significantly, the final reference on April 30, 2004, reads, "[r]emember I did not know about him." (Ex. B at ¶ 3, of Docket No. 82)

 Not only has Mr. X not made any statement linking defendant to the conspiracy alleged in the indictment, Attorney A is prepared to affirm to Court, under oath, that the following are the facts upon which he determined there would be no conflict in representing defendant:

> [Mr. X] had nothing to say about or against [defendant]. He did not even know [defendant]; had never met [defendant] or any other political figure

from the NPP; and had never been told or heard anything about [defendant] in connection with the payments which [Mr. X] made as alleged in the indictment.

(Resp. at 5, of Docket No. 69.) The Court may rely on counsel's representations that no conflict exists. *U.S. v. Santiago–Lugo*, 167 F.3d 81, 84 (1st Cir.1999); *see also Theodore v. State of N.H.*, 614 F.2d 817, 822 (1st Cir.1980) ("Attorneys are officers of the court and a judge has the right, in most circumstances, to rely on their representations to him."). Under these circumstances, where there is no showing that Mr. X can link defendant to the conspiracy alleged in the indictment, the Court cannot find that his anticipated testimony will be materially adverse.

The government's argument that "[Mr. X]'s testimony could corroborate the testimony of others who have direct evidence against defendant," (Reply at 3, of Docket No. 84), also fails to establish direct adversity vis-a-vis defendant. At most, Mr. X's testimony could be generally adverse, and that falls far short of the direct adversity required under Model Rule 1.9. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. 99–415 (1999) (interpreting Rule to prohibit the representation of interests that are "directly" as opposed to "generally" adverse). Given that the contours of Mr. X's anticipated testimony do not encompass defendant, it cannot be concluded that his testimony will be directly adverse to defendant. The government has failed to carry its heavy burden of proof regarding an actual conflict or the serious potential for one.

## B. Waiver of Attorney–Client Privilege

The government also argues that because of the continuing vitality of the attorney-client privilege, Mr. X should not

be subject to cross-examination by the very attorney to whom he disclosed confidences regarding the same matter. (Mot. at 12, of Docket No. 55)

By encouraging full and free discussion, better enabling the client to conform his conduct to law and present his legitimate claims and defenses, the privilege is the cornerstone of attorney-client relations. *See In re Keeper of Records,* 348 F.3d 16, 22 (1st Cir.2003). Because the privilege comes with substantial costs and impedes the truth-seeking process, however, courts must take care to apply it only to the extent necessary to achieve its underlying goals. *Id.* The party invoking the privilege bears the burden of establishing that the privilege applies and that it has not been waived. *Id.*

Mr. X revealed confidences to Attorney A for the purpose of seeking legal advice. Although Mr. X stated with regard to Attorney A, "he never was my lawyer," (Ex. B at 2, of Docket No. 82), even if an attorney-client relationship was not ultimately formed, the privilege still protects confidences revealed for the purpose of seeking representation. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. No. 90–358, Sept. 13, 1990 (recognizing attachment of privilege even where representation is declined).

However, the privilege only protects attorney-client communications; it does not protect disclosure of the underlying facts. *Upjohn Co. v. U.S.,* 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see U.S. v. Billmyer* 57 F.3d 31,37 (1st Cir.1995) (waiver where client told government results of investigations attorney conducted, and corresponding waiver as to the attorney file); *but cf. U.S. v. Rakes* 136 F.3d 1, 5 (1st Cir.1998) (no waiver where no showing client told anyone else about his communications with attorney, though he disclosed the facts shared with attorney).

Furthermore, the existence of the privilege, without more, does not bar attorneys from cross-examining former clients. *See U.S. v. Donatelli,* 484 F.2d 505, 506 (1st Cir.1973) (noting that attorney conducted a vigorous cross-examination of former client); *cf. U.S. v. Cunningham,* 672 F.2d 1064, 1073 (2d Cir.) (describing possible limitations in cross-examination of former client where privilege was not waived).

No precedent has been called to the attention of this Court, and the Court is aware of none, where an attorney, in the absence of a finding of conflict, has been disqualified simply because the former client does not want to be cross-examined by his former attorney. Thus even if the privilege were intact, the mere fact of a prior attorney-client relationship could not work the disqualification of defendant's counsel of choice. *See Cunningham* 672 F.2d at 1073–74.

Moreover, here, the privilege has been waived. Generally, the disclosure of attorney-client communications by the client to third parties destroys the privilege *in toto. See Cavallaro v. U.S.* 284 F.3d 236, 246–47 (1st Cir.2002); *see also U.S. v. Massachusetts Institute of Technology,* 129 F.3d 681, 685 (1st Cir.1997) ("the general principle that disclosure normally negates the privilege is worth maintaining. To maintain it here makes the law more predictable and certainly eases its administration."); *accord Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981) ("If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege."); *In re Grand Jury*

*Proceedings,* 78 F.3d 251, 254 (6th Cir. 1996) (noting voluntary disclosure of attorney's advice to a third party waives privilege because the disclosure runs counter to notion of confidentiality); *United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982); *In re Sealed Case,* 676 F.2d 793, 818 (D.C.Cir.1982); *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973).

██ At the April 30, 2004, meeting between the government and Mr. X, at which Mr. X was accompanied by counsel, Mr. X disclosed the contents of his communications with Attorney A without making any reservation. The government asked Mr. X to reveal information about "...categories of factual information that he conveyed to his then-attorney...." (Mot. at 3, of Docket No. 55) It took slightly over 6 pages of handwritten notes to summarize what he revealed. (Ex. B, of Docket No. 82)

According to the notes, Mr. X began by informing the government that "he [Attorney A] never was my lawyer." *Id.* at 1. He concluded by recounting that at the third and final consultation, he refused to hire Attorney A, because he intended to cooperate with the government, and in that event he would not be needing a trial attorney. *Id.* at 4. In between, it appears that Mr. X revealed precisely what he discussed with Attorney A regarding the SuperAqueduct, and also what he did not. Mr. X even divulged Attorney A's mental impressions regarding whether he had committed a crime. *Id.* ("his analysis was there was nothing to catch me on").

The record reflects that Mr. X disclosed Attorney A's mental impressions, the fact that Attorney A analyzed for Mr. X the differences between bribery and extortion, that he counseled Mr. X that he might be in trouble and to remain calm, that he advised Mr. X not to discuss these matters with any other people, and the names and roles of other persons who participated with Mr. X in the circumstances under investigation. *Id.* at 1–6. In the description of the last minutes of the final meeting, the notes state verbatim:

> When FBI contacted [Mr. X] he went to see [Attorney A]. 2 agents went to see me. You have to determine if I'm your lawyer or not. Let's analyze. He drew 7 scenarios, of the 7 I'm willing to be your lawyer on 3 of them. All meant no cooperation because he was a fighting lawyer. So if you did nothing, did nothing [sic.], I'm your lawyer. On 4, with some cooperation, not willing to be my lawyer. Your decision, take one day. I said No. Okay, I'm not your lawyer. [...] His analysis was there was nothing to catch me on, referral [Attorney B]. Think it over, you are wrong, let's fight together. Trial lawyer not a negotiating lawyer his understanding....

*Id.* at 4.

The important disclosures made by Mr. X notwithstanding, the government cites *Keeper,* arguing that, "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all communications on the same subject matter." (Reply at 6, of Docket No. 84) However, that portion of Keeper pertains to how much further beyond what is actually revealed a waiver can extend. *In re Keeper of Records* 348 F.3d 16, 24–25 (1st Cir.2003). In *Keeper,* the Court of Appeals first determined that "it is crystal clear that any previously privileged information actually revealed...lost any veneer of privilege." *Id.* at 23. The proverbial "bone of contention" was whether that waiver had a "ripple effect." *Id.* The Court of Appeals reasoned that a rule that would allow broad subject matter waivers to be implied from commercial negotiations

to which privilege never attached would provide perverse incentives: "parties would leave attorneys out of commercial negotiations for fear that their inclusion would later force wholesale disclosure of confidential information...which would strike at the heart of the attorney-client relationship...." *Id.* 24–25.

The case at bar, however, is not about a limited disclosure made by an attorney from which a more comprehensive *Keeper* waiver might be implied; but rather, a broad disclosure, made by the client, in the client's interest as a government witness, from which only a coextensive waiver might be implied. Where a client chooses to share communications between himself and his lawyer outside the "magic circle" of secretaries and interpreters, the courts have usually found a waiver of the privilege. *See U.S. v. M.I.T.* 129 F.3d at 684 (citations omitted). Although the client may have intended to maintain confidentiality, that is insufficient in order to ensure the continued validity of the privilege. *Id.* at 685. Under these circumstances, the Court is obligated to find that Mr. X waived the privilege, because he revealed in detail the contents of his communications with Attorney A to the government, thereby voiding the privilege. He cannot now resurrect it.

The government also argues that the reasoning in the second half of *Keeper* precludes a finding of waiver because a written acknowledgment of a privilege reservation is not required by law. (Reply at 9, of Docket No.84) However, in this case, unlike *Keeper,* not only was there no written acknowledgment of the reservation of the privilege, there was no reservation of privilege whatsoever. It is clear from the record before this Court that Mr. X refused to waive "additional" information, admitting thereby that a waiver had already occurred. (Ex. D at ¶1, of Docket No. 82) Mr. X was represented by counsel when he made his disclosures about his communications with Attorney A to the government. If those disclosures were made for the purpose of investigating whether a privilege existed in order to raise that claim in preparation for trial, then clearly the privilege should have been reserved. Here, no privilege was reserved, and there is no semblance of any attempt to reserve it.

With regard to the extent of the waiver, the government argues that "the information conveyed [to the government] ...was *not* coextensive with all communications between lawyer and client." (Reply at 2, of Docket No.84) [emphasis in original] In support, the government cites a letter where Mr. X's counsel, states that, "waiving the privilege would expose my client to full cross-examination by [Attorney A] that may expose sensitive information not related to this case." (Ex. D at ¶1, of Docket No. 82) The government further argues that there may also exist confidential information that the client does not recall sharing with Attorney A. (Mot. at 12, of Docket No. 55) Such contentions notwithstanding, the general tendency of the law is to treat waivers as "an all-or-nothing proposition." *See U.S. v. Billmyer,* 57 F.3d 31, 37 (1st Cir.1995). Furthermore, there is no standard for the protection of speculations. The Court therefore finds a complete waiver.

### C. Confidentiality

The government also argues that Mr. X has an independent interest in not having his confidences revealed by his former counsel during cross-examination. (Mot. at 11, of Docket No. 55) The duty of confidentiality is far broader than the narrow duty underpinning the attorney-client privilege. *See* Model Rules of Professional Conduct Rule 1.6, n.3 (2003). As one of

the hallmarks of the attorney-client relationship, confidentiality is of grave importance. It is incontrovertible that even where the privilege does not apply, a lawyer owes a duty of care in protecting the confidences of a client, even those of a prospective client with whom no attorney-client relationship is formed. *See* ABA Comm. on Ethics and Professional Responsibility, Formal Op. No. 90–358, Sept. 13, 1990.

Model Rule 1.9(c) sets forth this essential principle, providing that: "A lawyer who has formerly represented a client in a matter ... shall not thereafter...use information relating to the representation to the disadvantage of the former client...." Model Rules of Professional Conduct Rule 1.9(c). By its own terms, not only does Model Rule 1.9(c) apply to the information covered by the attorney-client privilege, but to all information relating to the representation, whether obtained from the client or from another source. *See* Model Rules of Professional Conduct Rule 1.6, n.3.

A confidence, however, is subject to destruction. Model Rule 1.9(c) recognizes exceptions to the duty of confidentiality, "...as these Rules would permit or require with respect to a client, or when the information has become generally known." Model Rule 1.9(c). The commentary to Model Rule 1.9(c) further recognizes and emphasizes that "the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client." Model Rule 1.9 cmt 8. Moreover, "...the Model Rules do not prohibit the use to the disadvantage of the would-be client of information relating to the representation once the information becomes generally known." ABA Comm. on Ethics and Professional Responsibility, Formal Op. No. 90–358, Sept. 13, 1990.

■ The government argues that cross-examination of Mr. X by Attorney A would be improper because Attorney A learned confidential information during his consultations with Mr. X. (Mot. at 10, of Docket No. 55) This argument fails to account for the express textual exception in Model Rule 1.9 for information that is "generally known." Although the information divulged by the client is not yet generally known, because thus far, it has only been divulged to the grand jury, Mr. X will publicly reveal this information when he testifies at trial. Moreover, even if his attorney-client privilege were intact, and this Court finds that it is not, Mr. X cannot have a residual expectation of confidentiality where he testified before the grand jury and will testify at trial, as per his cooperation agreement with the government.

A further infirmity in the government's argument is its reliance upon the "substantially-related" test for conflict. *See Borges v. Our Lady of the Sea Corp.*, 935 F.2d 436, 439–40 (1st Cir.1991) ("...the relevant inquiry is whether the subject matter of the two representations is 'substantially related'; could the attorney have obtained confidential information in the first suit that would have been relevant to the second."). This test stems from the seminal case, *T.C. Theatre Corp.*:

> I hold that the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client.

*T.C. Theatre Corp. v. Warner .Bros. Pictures*, 113 F.Supp. 265, 268 (S.D.N.Y.1953); see *Kevlik v. Goldstein*, 724 F.2d 844, (1st Cir.1984) (surveying application of *T.C. Theatre Corp.* test). The substantially-related test for conflicts is grounded in the

predecessor Model Code which had been adopted by the presiding court in *T.C. Theatre Corp. See* 113 F.Supp. at 272, n. 4. The Model Code is no longer the standard in this jurisdiction. It has instead been replaced by the fact-intensive determination required under Rule 1.9(a). *See* ABA Annotated Model Rules of Professional Conduct, Rule 1.9 Annotation. Furthermore, the predecessor Model Code defined a "confidence" as "information protected by the attorney-client privilege," foreclosing any argument whatsoever about confidentiality in this case. *See id.* at Rule 1.6 Annotation. Thus the precedent cited by the government is inapplicable to the case at bar because it pertains to a standard of conflict that has been superceded by the more stringent standards of Model Rule 1.9(a).

The government also contends that there is a potential conflict in the possibility that Attorney A may reveal information unrelated to this case about Mr. X, even information Mr. X does not recall relating to Attorney A. (Mot. at 12, of Docket No. 55) Such information would be immaterial to a finding of conflict under Rule 1.9(a), and under any test, because it is not related to the case. If such Model Rule 1.9(c) information was learned, similar to any other confidence, it is Attorney A's duty to maintain it confidential, but it is irrelevant with regard to whether a former client conflict under Model Rule 1.9(a) exists.

At most, there is an argument for potential conflict. However, the government has failed to present any precedent for disqualifying a criminal defendant's counsel of choice, where despite a waiver of the attorney-client privilege by the former client, the attorney may theoretically have some residual confidential information. Most reported cases requiring disqualification pose far more serious conflicts than the case at bar. *See Wheat,* 486 U.S. at

163–64 ("Here the District Court was confronted not simply with an attorney who wished to represent two coequal defendants in a straightforward criminal prosecution; rather, Iredale proposed to defend three conspirators of varying stature in a complex drug distribution scheme"); *U.S. v. Voigt,* 89 F.3d 1050, 1078–79 (3d Cir. 1996) (disqualification affirmed, but the attorney had represented several codefendants who continued to be involved in the case, one of whom refused to waive her rights), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996); *U.S. v. McCutcheon,* 86 F.3d 187, 189 (11th Cir. 1996) (disqualification affirmed where codefendant refused to waive any rights); *U.S. v. Ross,* 33 F.3d 1507, 1523 (11th Cir.1994) (earlier client did not waive any rights); *U.S. v. Locascio,* 6 F.3d 924, 932 (2d Cir.1993) (possibility existed that attorneys were accomplices in the crime, would themselves be called as witnesses, and that they had been inside counsel for entire Gambino crime family, of which the defendants were members); *but see In re Grand Jury Proceedings,* 859 F.2d at 1024–26 (disqualification reversed where both the present client and the past client waived any right to conflict-free representation and court found no direct link between clients).

In contrast, the hypothetical conflict presented here does not meet the "serious potential for conflict" standard announced by the Supreme Court in *Wheat,* and cannot serve as a basis for denying a criminal defendant his Sixth Amendment right to counsel of choice. *See Wheat,* 486 U.S. at 164, 108 S.Ct. 1692 (determining that presumption in favor of defendant's counsel of choice may be overcome by demonstration of actual conflict or "serious potential for conflict").

### D. Duty of Loyalty

As a further basis for disqualification, the government submits defendant's right

to be represented by counsel free of conflict. (Mot. at 14, of Docket No. 55) The government argues that because Attorney A may have a residual duty of confidentiality to his former client, and therefore cannot use all the information at his disposal, he cannot zealously represent defendant. *Id.*

 Where there is neither an actual conflict nor the serious potential for one, the right to counsel free of conflict can be waived. *See Wheat,* 486 U.S. at 163, 108 S.Ct. 1692. Under these circumstances, given the limited nature of the former representation and the waiver of the attorney-client privilege by Mr. X, the Court sees no reason why defendant is not entitled to make a corresponding waiver. If defendant's right to counsel of choice potentially conflicts with his right to an attorney of undivided loyalty, the choice as to which right shall have precedence should be left to defendant and not dictated by the government. *See U.S. v. Cunningham,* 672 F.2d 1064, 1073–74 (2d Cir.) (permitting waiver of right to counsel free of conflict). Accordingly, the Court will hold a "Foster" hearing to review the risks inherent in such a representation with defendant. *United States v. Foster,* 469 F.2d 1, 5 (1st Cir.1972) (requiring court to conduct a hearing to inquire into the adequacy of a defendant's representation in case of possible conflict of interest).

### E. *Appearance of Impropriety*

The government also argues that Attorney A should be disqualified from representing defendant in order to avoid "the appearance of impropriety." (Reply at 16, of Docket No. 84) Simply put, the appearance-of-impropriety standard pertains to the predecessor Model Code and is no longer the standard in this jurisdiction. This elastic standard has been replaced by the fact-intensive determination required under Rule 1.9. *See* ABA Annotated Model Rules of Professional Conduct, Rule 1.9 Annotation (2003).

 If there is any impropriety reflected in the record, it is the apparent manufacturing of a conflict. Trial courts are aware of the possibility that the government may seek to manufacture a conflict "and must take it into consideration along with all of the other factors that inform this sort of decision." *Wheat,* 486 U.S. at 163, 108 S.Ct. 1692. Given the insignificance of Mr. X's testimony vis-a-vis defendant, the intensity of the government's investigation into the relationship between Mr. X and his former counsel, and the wording of the waiver suggested by the government, it appears that the government's intention at the time of its interviews with the witness was something other than an inquiry into whether there was reason to disqualify defense counsel.

Had the primary purpose behind the government's April 30, 2004, meeting been to determine whether an attorney-client relationship existed, so as to maintain its privileged status, a reservation should have been made before the questioning. And, moreover, the questioning of the witness should have been far more limited, or better yet, confined to a few questions with the witness' counsel.

Not only was this not the case, but the government's letter following the interview requests a waiver "in order to give us access to, among other documents, notes that [Attorney A] generated during consultations with your client." (Ex. C at ¶ 2, of Docket No. 82) This phrasing makes clear that at the time, the government was concerned with something other than disqualifying Attorney A over a conflict of interest, for such a waiver, had it been obtained, would have foreclosed any conflict-of-interest argument whatsoever.

The timing of the government's motion for disqualification is also troubling. The government had notice of the potential conflict at the latest by April 30, 2004, the date of the meeting with Mr. X. (Ex. B, of Docket No. 82) Nonetheless, the government's motion to disqualify was not filed until July 15, 2004, almost three months later. (Docket No. 55) While even dilatory disqualification motions ought be considered by the Court when an attorney has privileged information about the former client, *Kevlik* 724 F.2d at 848, in this case, no privileged information exists because the privilege was waived, and the length of the delay only further underscores the tactical purpose of the motion.

It is also of import that Trial Attorney's notes of the meeting during which Mr. X discussed his consultations with Attorney A, the first annotation reads "he never was my lawyer." (Ex. B at 2, of Docket No. 82) Although Trial Attorney in a Sworn Statement interprets that comment as a chronological reference to the period before Mr. X's consultation with Attorney A, the comment speaks for itself. *Id.* at 1. Moreover, Trial Attorney makes no effort to explain the notes regarding Mr. X's revelation that the purpose of the third and final consultation between himself and Attorney A was to "decide if I'm your lawyer or not." *Id.* at 4.

In view of the tenor of the former attorney-client relationship, as revealed by that comment, it is disingenuous to say that there is a serious potential for a conflict of interest. Furthermore, when coupled with the waiver of whatever privilege existed via the extensive revelations to the government, and the fact that Mr. X has already testified and will testify again as an immunized witness, there is at most a minimal residual of confidentiality, and therefore, low risk of conflict.

Ultimately, it appears that the government attempted to shoehorn into the conflict standards what was most likely a consultation and at most an unobjectionable successive representation. "The purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." ABA Annotated Model Rules of Professional Conduct, Scope (2003).

> [W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.

*Wheat v. U.S.,* 486 U.S. at 162, 108 S.Ct. 1692 (quoting *United States v. Dolan,* 570 F.2d 1177, 1184 (3d Cir.1978)). Here, however, despite the concerns enunciated by the government, the Court finds neither actual conflict nor a serious potential for one. If defendant chooses to waive his right to counsel free of conflict, the Court harbors no misgivings about accepting defendant's waiver. In light of this Court's findings, the motion to disqualify is **DENIED.**

**IT IS SO ORDERED.**